MEMORANDUM
 

 EDUARDO C. ROBRENO, District Judge.
 

 Plaintiff J. Mati Bloch is a physicist formerly employed as an associate professor at Temple University, a public university with its main campus in Philadelphia, Pennsylva
 
 *389
 
 nia. Defendants are Temple University, Raza Tahir-Kheli, chair of Temple’s physics department, C.J. Martoff, safety officer of Temple’s physics department, and Robert Intemann, Leroy Dnbeck, Theodore Mihalisin, Sigurd Larsen and Leonard Auerbach, all faculty members at Temple and members of the Policy and Personnel Committee (“P & P Committee”), of Temple’s physics department.
 

 Plaintiff alleges that defendants violated his constitutional rights and Pennsylvania state law in connection with defendant Temple University’s decision not to grant him tenure. Defendants have moved for summary judgment asserting that plaintiff has not proffered legally sufficient evidence to support his claims. For the reasons set forth herein, defendants’ motion will be granted as to counts II, IV and V of the second amended complaint and denied as to counts I and III.
 

 I. BACKGROUND
 
 [1]
 

 In the fall of 1989, plaintiff, then employed as a guest scientist at Brookhaven National Laboratory and as a visiting scientist at Princeton University, applied for a tenure track associate professor position at Temple University (“Temple”), to begin in the fall of 1990. (Plf.’s Counterstatement of Facts, doe. no. 34 at 1-2; App.Plf.’s Mem.Contra Defs.’ Mot.Summ.J., doc. no. 34, Ex. 7) Plaintiff was hired by Temple and on October 17, 1990, was assigned laboratory and office space on the fourth floor of a Temple University building, Barton Hall. (Plf.’s Counter-statement of Facts, doc. no. 34 at 3-4) In addition to laboratories, the fourth floor of Barton Hall contained graduate student offices, Temple’s physics lounge and a mechanical room.
 
 (Id.
 
 at 4)
 

 According to plaintiff, when he entered his laboratory, he found it “aging and decayed” and “in a state of extreme neglect and disrepair.”
 
 [2]
 

 (Id.
 
 & n. 9) By memo dated November 7,1990, plaintiff immediately notified the physics department safety officer, defendant Martoff, the department chair, defendant Tahir-Kheli, the department’s space committee and the professor who formerly supervised the laboratory of his findings.
 
 (Id.
 
 at 5) On November 15, 1990, plaintiff wrote to defendant Tahir-Kheli informing him again that he believed the lab constituted a safety hazard.
 
 (Id.
 
 at 6) Plaintiff contends that at his insistence, defendants Martoff and Tahir-Kheli reported the situation to university authorities.
 
 (Id.
 
 at 6 n. 12)
 

 After inspecting the area at issue, Temple’s biohazard control officer P.D. Forbes concluded that the area should be placed “off limits to anyone other than persons qualified in hazardous materials management” and that air flow from the fourth floor should be restricted.
 
 (Id.
 
 at 6-7) Stating that “an emergency has arisen with regard to the presence of hazardous waste materials,” by memo dated November 19, 1990, defendant Tahir-Kheli instructed that the entire fourth floor of Barton Hall, including the physics lounge and the graduate student offices be closed.
 
 (Id.
 
 at 7) ENSI, an outside contractor specializing in the removal of toxic chemicals was hired by Temple to rectify the situation.
 
 (Id.)
 
 According to plaintiff, on February 13, 1991, large amounts of toxic materials and unidentified materials were re
 
 *390
 
 moved from plaintiff’s fourth floor laboratory.
 
 (Id.)
 
 Plaintiff states that the cleanup was not completed 'until August or September 1991, at which time the fourth floor of Barton Hall was reopened for renovations and other traffic.
 
 (Id.
 
 at 8)
 

 Plaintiff avers that his revelations concerning the conditions on the fourth floor of Barton Hall prompted hostile reactions from many of plaintiff’s colleagues, including defendants. (Id. at 8-9) According to plaintiff, the ultimate result of this hostility was Temple’s failure to extend him an offer of tenure.
 
 (See Id.
 
 at 9-13)
 

 As plaintiff states, the procedure for awarding tenure to members of Temple’s faculty is governed by the terms of the collective bargaining agreement in place between the University and the faculty’s exclusive collective bargaining agent, the Temple Association of University Professionals (“TAUP”).
 
 (See
 
 Pl.’s Mem.Contra Defs.’ Mot.Summ.J., doc. no. 34 at 22-23) Under the collective bargaining agreement, associate professors, such as plaintiff, are appointed initially for a term of three years, followed either by the granting of tenure or termination with one year’s notice.
 
 (See
 
 App.Ex. Supp.Defs.’ Mot.Summ.J., doc. no. 32, Ex. 12) Tenure decisions are based on a judgment as to whether “an individual meets the accepted standards for (1) teaching; (2) scholarship, research or creative work; and (3) service within and outside the University appropriate to rank.”
 
 (Id.)
 

 At Temple, initial consideration of tenure cases takes place at the departmental level.
 
 (Id.)
 
 Following action by the department, the department chair makes an independent recommendation and transmits it, along with the recommendation of the departmental committee, to the college level for consideration.
 
 (Id.)
 
 Following consideration at the college level, the college Dean makes an independent recommendation and then transmits all recommendations to the chair of the Council of Deans.
 
 (Id.)
 
 If all prior recommendations are in agreement, the chair of the Council of Deans must submit the recommendations to the Council of Deans for “information.”
 
 (Id.)
 
 If there is disagreement among preceding recommendations, the chair must submit all materials relating to the tenure case to the Council of Deans for advice.
 
 (Id. )
 
 Any of the agencies of the University involved in the tenure process may initiate action for review of a tenure recommendation with the Council of Deans.
 
 (Id.)
 

 All tenure recommendations must be forwarded by the chair of the Council of Deans to the President of the University for transmittal to the Board of Trustees.
 
 (Id.)
 
 If tenure is denied, an appeal may be presented by the faculty member to the Personnel Committee of the Faculty Senate, which is then required to forward its recommendations to the appropriate officers of the University for transmittal to the Faculty Senate and the Board of Trustees.
 
 (Id.)
 

 Plaintiff contends that in October 1991, when plaintiff first applied for tenure and promotion to full professor within the University, P
 
 &
 
 P Committee chair, defendant Tahir-Kheli informed him that there was mounting opposition to his tenure due to plaintiffs insistence on proper remediation and appropriate overhaul of plaintiffs Barton Hall laboratory. (Plf.’s Counterstatement of Facts, doc. no. 34 at 11) Defendant Tahir-Kheli’s warnings aside, on November 8,1991, and November 11, 1991, the P & P Committee and the Departmental
 
 Tenure
 
 Committee respectively, voted to recommend plaintiff for tenure.
 
 [3]
 

 (Id.
 
 at 13-14) On December 18, 1991, the College Tenure Committee also voted in favor of plaintiffs tenure.
 
 (Id.
 
 at 14)
 

 According to plaintiff, on the afternoon of December 18, 1991, at the request of defendant Tahir Kheli, the P & P Committee held a
 
 meeting at
 
 which the Committee voted to request permission to reconsider plaintiff’s tenure and promotion. (Id. at 15) On January 20,1992, the Tenured Faculty Committee voted not to reconsider their earlier positive recommendation for plaintiffs tenure. (Id. at 16) Plaintiff states that by February of 1992, all reviewing bodies had voted in favor
 
 *391
 
 of plaintiffs tenure — only Temple’s Board of Trustee’s had not yet considered plaintiffs tenure application.
 
 (Id.
 
 at 17)
 

 In April 1992, defendants Auerbach, Mar-toff and Tahir-Kheli and defendants Intemann, Larsen and Mihalisin wrote letters to Lois Cronholm, then Dean of the College of Arts and Sciences, requesting the remand of plaintiffs tenure review file to the physics department for reconsideration.
 
 (Id.
 
 at 17-18) In their letters, defendants cited delay in the construction of plaintiffs laboratory, plaintiffs problematic relationships with his research assistants and students, as well as other University faculty and staff, plaintiffs failure to submit a grant proposal and plaintiffs refusal to spend his start-up funds as justification for their request.
 
 (Id.
 
 at 18-22) Plaintiff contends that defendants’ alleged justifications for their request were merit-less.
 
 (Id.)
 

 According to plaintiff, on the basis of defendants’ letters, Dean Cronholm wrote Acting Provost Ericksen requesting that plaintiffs tenure file be remanded to the physics department.
 
 (Id.
 
 at 22-23) Acting Provost Ericksen complied with Dean Cronholm’s request and on April 24, 1992, the physics department voted against tenure for plaintiff.
 
 (Id.
 
 at 23) At approximately the same time, plaintiffs start-up funds were frozen and work on his laboratory was halted.
 
 (Id.)
 

 Determining that “the Physics Department has acted with eapriciousness, undue speed and ambiguity” in its remanding of plaintiff’s tenure file, on April 28, 1992, the College Tenure Committee “strongly voted” to uphold its grant of tenure to plaintiff.
 
 (Id.)
 
 Despite'the Colege Tenure Committee’s positive recommendation, however, Dean Cronholm and the full Council of Deans recommended against plaintiffs tenure.
 
 (Id.
 
 at 23-24)
 

 Plaintiff states that in early June 1992, he had a telephone conversation with Temple’s new provost James England.
 
 (Id.
 
 at 24) Plaintiff contends that during their conversation, Provost England promised plaintiff that if plaintiff agreed to defer his tenure consideration for one year, renovations on his laboratory would resume promptly and consideration of his tenure, which would exclude plaintiffs 1991-1992 review, would be a matter of new impression.
 
 (Id.)
 
 On June 15, 1992, plaintiff signed a letter agreement with Temple deferring his tenure review until the 1992-1993 academic year.
 
 (Id.)
 
 TAUP, the faculty’s exclusive bargaining agent, was not a party to this agreement. According to plaintiff, defendant Temple agreed that the outside references from plaintiffs 1991-1992 tenure review would be utilized the following year.
 
 (Id.)
 
 Plaintiff asserts that the promise made to him for a “fresh and fair” review was reflected in a memorandum from Provost England to Dean Cronholm and defendant Tahir-Kheli dated June 18, 1992.
 
 (Id.)
 

 Pursuant to his letter agreement with Temple, in the fall of 1992, plaintiff was once again considered for tenure.
 
 (Id.
 
 at 25) Plaintiff contends, however, that his new tenure review was anything, but “fresh and fair.”
 
 (See Id.
 
 at 25-37) Plaintiff argues that the P & P Committee was biased against him and that additional references were requested in contravention of his letter agreement with Temple.
 
 (Id.
 
 at 25-28) The result was that on December 10, 1992, the full Departmental Tenure Committee voted to deny plaintiff tenure.
 
 (Id.
 
 at 28) According to plaintiff, the Majority Report and individual evaluations of plaintiff issued by the Departmental Tenure Committee contained false and inaccurate statements about plaintiffs teaching, ethics and social skills.
 
 (Id.
 
 at 28-35)
 

 Citing many of the allegations made in the individual evaluations of plaintiff prepared by the tenured faculty, on March 16,1993, Dean Carolyn Adams, who had replaced Dean Cronholm in the summer of 1992, recommended against plaintiffs tenure.
 
 (Id.
 
 at 37) By letter dated March 27, 1993, plaintiff was informed that the Council of Deans had voted to recommend against tenure.
 
 (Id.)
 
 By letter dated May 25, 1993, plaintiff was informed that the Board of Trustees had also voted to deny him tenure.
 
 (Id.
 
 at 37-38) Plaintiff filed an appeal of the tenure denial on August 27, 1993.
 
 (Id.
 
 at 38) According to plaintiff, during the appeal process defendants Martoff, Auerbach and Tahir-Kheli repeated the statements to the Faculty Senate
 
 *392
 
 Personnel Committee which had formed the basis of their negative evaluations.
 
 (Id.)
 

 On February 25, 1994, the Faculty Senate Personnel Committee denied plaintiffs appeal.
 
 (See
 
 App.Ex.Supp.Defs.’ Mot.Summ.J., doc. no. 32, Ex. 29) By letter dated June 22, 1994, TAUP informed plaintiff that contrary to his April 5, 1994, request, it would not submit Temple’s decision denying plaintiff tenure to arbitration.
 
 (See Id.
 
 at Ex. 79)
 

 II. STANDARD OF REVIEW
 

 To prevail on a motion for summary judgment, a
 
 moving
 
 party must establish that no genuine issues of material fact remain in dispute and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). An issue is “genuine” only if “there is evidence from which a reasonable trier of fact could find in favor of the non-moving party, viewing the record as a whole in light of the evidentiary burden the law places on that party.”
 
 United States v. Premises Known as 717 S. Woodward St., Allentown, Pa.,
 
 2 F.3d 529, 533 (3d Cir.1993) (citing
 
 Anderson v. Liberty Lobby, Inc.,
 
 477 U.S. 242, 252-56, 106 S.Ct. 2505, 2512-14, 91 L.Ed.2d 202 (1986)). A factual dispute is “material” only if it “might affect the outcome of the suit under the governing law.”
 
 Anderson,
 
 477 U.S. at 248, 106 S.Ct. at 2510, 91 L.Ed.2d 202.
 

 When ruling on a motion for summary judgment, the deciding court must view the evidence in the light most favorable to the nonmovant.
 
 Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,
 
 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986);
 
 Mellon Bank Corp. v. First Union Real Estate Equity & Mortgage Inv.,
 
 951 F.2d 1399, 1404 (3d Cir.1991). The court must accept the nonmovant’s allegations as true, and resolve conflicts in the nonmovant’s favor.
 
 Big Apple BMW, Inc. v. BMW of N. Am., Inc.,
 
 974 F.2d 1358, 1363 (3d Cir.1992),
 
 cert. denied,
 
 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993). The moving party bears the burden of “ ‘showing’ — that is, pointing out to the district court — that there is an absence of evidence to support the non-moving party’s case.”
 
 Celotex Corp. v. Catrett,
 
 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). If the movant makes a showing that there is no genuine issue of material fact, the nonmoving party may not rest on its pleadings. In these circumstances, the non-moving party must go beyond the pleadings to “establish the existence of each element on which it bears the burden of proof.”
 
 J.F. Feeser, Inc. v. Serv-A-Portion, Inc.,
 
 909 F.2d 1524, 1531 (3d Cir.1990),
 
 cert. denied,
 
 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991).
 

 III. DISCUSSION
 

 A.
 
 Free Speech Claims
 

 In Counts I and III of the second amended complaint, plaintiff alleges that the defendants impermissibly retaliated against him “for his exposure of the dangerous conditions on the fourth floor lab of Barton Hall and his exercise of his right to free speech.” (Second Am.Compl., doc. no. 12 at ¶ 102, 106) Plaintiff argues that defendants’ actions violated his First Amendment Rights protected under 42 U.S.C. § 1983, the Pennsylvania Constitution and Pennsylvania’s public policy.
 

 A public employee’s claim of retaliation for engaging in protected activity is examined under a three-step analysis:
 

 First,
 
 the plaintiff must show that the activity in question was protected. To deserve protection, “the speech must be on a matter of public concern, and the employee’s interest in expression on this matter must not be outweighed by any injury the speech could cause to the interest of the state as an employer in promoting the efficiency of the public services it performs through its employees.”
 
 Second,
 
 the plaintiff must show that the protected activity was a substantial or motivating factor in the alleged retaliatory action.
 
 Finally,
 
 the employer can establish that it would have taken the adverse employment action regardless of whether the employee had engaged in protected conduct.
 

 Pro v. Donatucci
 
 81 F.3d 1283, 1288 (3d Cir.1996) (citing
 
 Watters v. City of Philadelphia,
 
 55 F.3d 886, 892 (3d Cir.1995) (other citations omitted)) (emphasis added). The “threshold issue” here, therefore, is whether plaintiffs exposure of the allegedly danger
 
 *393
 
 ous conditions on the fourth floor of Barton Hall constituted speech on a matter of “public concern.”
 
 See Watters,
 
 55 F.3d at 892 (citation omitted). Whether speech touches on a matter of public concern is a legal question to be determined by the court, not the finder of fact.
 
 See Connick v. Myers,
 
 461 U.S. 138, 148 n. 7, 103 S.Ct. 1684, 1690 n. 7, 75 L.Ed.2d 708 (1983);
 
 Pro,
 
 81 F.3d at 1288.
 

 1.
 
 Public concern
 

 “An employee’s speech addresses a matter of public concern when it can be ‘fairly considered as relating to any matter of political, social, or other concern to the community.’”
 
 Pro,
 
 81 F.3d at 1288 (quoting
 
 Holder v. City of Allentown,
 
 987 F.2d 188, 195 (3d Cir.1993) (quoting
 
 Connick,
 
 461 U.S. at 146, 103 S.Ct. at 1690)). In such eases, the employee’s speech is protected. However,
 

 when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee’s behavior.
 

 Id.
 
 (quoting
 
 Connick,
 
 461 U.S. at 147, 103 S.Ct. at 1690). The public concern inquiry must be determined by reference to the “ ‘content, form, and context of a given statement, as revealed by the whole record.’ ”
 
 Id.
 
 (quoting
 
 Connick,
 
 461 U.S. at 147-48, 103 S.Ct. at 1690). The Third Circuit discussed this analysis in
 
 Holder:
 

 The content of the speech may help to characterize it as relating to a matter of social or political concern of the community if, for example, the speaker seeks to ‘bring to light actual or potential wrongdoing or breach of public trust’ on the part of government officials. The form and context of the speech may help to characterize it as relating to a matter of social or political concern to the community if, for example, the forum where the speech activity takes place is not confined merely to the public office where the speaker is employed.
 

 Id.
 
 (quoting
 
 Holder,
 
 987 F.2d at 195 (citations omitted)). If the court concludes that the speech concerns private rather than public matters, it need not proceed to a consideration of the employer’s interests.
 
 Id.
 
 (citing
 
 Connick,
 
 461 U.S. at 146, 103 S.Ct. at 1689-90).
 

 Following the teachings discussed above, the Court concludes that here, plaintiffs statements embodied matters of public concern. On their face, statements regarding the improper storage of toxic and unidentified materials within a public university laboratory appear to raise issues which can be “fairly considered as relating to [a] matter of political, social, or other concern to the community.”
 
 Id.
 
 (citations and internal quotations omitted). Defendants argue, however, that “the context in which plaintiffs complaints were made and the form that they took reflect that plaintiff was speaking as an employee and was not trying to expose any wrongdoing or to inform the public of any health or safety hazard.” (Mem.Law Supp. Defs.’ Mot.Summ.J., doe. no. 31 at 34) Consequently, defendants contend, plaintiffs statements should not be found to have related to matters of public concern. The Court disagrees.
 

 While plaintiff undeniably had a personal stake in the cleanup of Barton Hall’s fourth floor, the Third Circuit has made clear that although plaintiffs motivation is one factor to be considered, it is “not necessarily controlling in assessing the character of [plaintiffs] speech.”
 
 Zamboni v. Stamler,
 
 847 F.2d 73, 78 (3d Cir.) (quoting
 
 Rode v. Dellarciprete,
 
 845 F.2d 1195, 1201 (3d Cir.1988)),
 
 cert. denied,
 
 488 U.S. 899, 109 S.Ct. 245, 102 L.Ed.2d 233 (1988). Moreover, the “mere fact” that plaintiffs statements regarding-the cleanup of his lab may have been an outgrowth of personal disputes “does not prevent some aspect of [those statements] from touching upon matters of public concern.”
 
 Johnson v. Lincoln Univ.,
 
 776 F.2d 443, 451 (3d Cir.1985). Even if as defendants claim, plaintiffs statements regarding the cleanup were largely composed of matters of only personal concern, this fact would only become relevant when balancing plaintiffs interests in expression with any injury his
 
 *394
 
 speech could cause to the interests of the state, “not in the determination whether the speech touches upon matters of public concern.”
 
 Id.
 

 The Court finds
 
 Smith v. Fruin,
 
 28 F.3d 646 (7th Cir.1994),
 
 cert. denied,
 
 — U.S. -, 115 S.Ct. 735, 130 L.Ed.2d 638 (1995), relied on by defendants, distinguishable from the case at bar. In
 
 Smith,
 
 a police detective brought suit against his superiors alleging that he had been given a sham surveillance assignment as punishment for complaining about smoking in the workplace. Although it acknowledged that “[cjontent is the most important ... factor” to consider in determining whether a statement is a matter of public concern,
 
 Id.
 
 at 651 (citation omitted), the Seventh Circuit found that the detective’s statements were not protected. The Court reasoned that while the issue of second hand smoke was a matter of widespread public interest, the detective’s complaints were all framed strictly in terms of his own interests and were made by him solely on his own behalf.
 
 Id.
 
 at 651-53.
 
 [4]
 

 While the Court agrees that here plaintiffs motivation was self-interested, as discussed above, this fact is not dispositive. “Indeed, it is unlikely that any employee who lacks a personal interest in the subject that gives rise to the speech in question would file a lawsuit to vindicate his or her First Amendment rights.”
 
 Zamboni,
 
 847 F.2d at 78 (analyzing the Supreme Court’s decision in
 
 Con-nick
 
 and concluding that “[w]ere motivation rather than content dispositive” the Supreme Court would not have found any of the statements at issue in
 
 Connick
 
 matters of public concern). As the Seventh Circuit stated in
 
 Smith,
 
 “the content of some remarks may lift the speech to the level of public concern even if the employee’s reasons for speaking out are entirely self-interested.”
 
 Smith,
 
 28 F.3d at 652 (citations omitted);
 
 see Belk v. Town of Minocqua,
 
 858 F.2d 1258, 1263-64 (7th Cir.1988) (“content is the greatest single factor in the
 
 Connick
 
 inquiry”) (quoting
 
 Berg v. Hunter,
 
 854 F.2d 238, 242-43 (7th Cir.1988),
 
 cert. denied,
 
 489 U.S. 1053, 109 S.Ct. 1314, 103 L.Ed.2d 583 (1989)). In the present case, the Court finds that the potential danger to uninformed individuals arising from the presence of the allegedly poisonous and unidentified substances which plaintiff discovered in his lab argues strongly in favor of finding the content of plaintiffs speech a matter of public concern regardless of plaintiffs personal interest in the remediation efforts.
 

 Furthermore, unlike the purely “individual” relief sought by the detective in
 
 Smith,
 
 the relief sought by plaintiff here, had ramifications for others including those who would be working with plaintiff in the lab, and as evidenced by the University’s response, any person having business on the fourth floor of Barton Hall.
 
 [5]
 
 Additionally, the statements plaintiff alleges precipitated retaliatory action against him were not only voiced by plaintiff privately, as were the majority of the statements made in
 
 Smith, see Smith
 
 28 F.3d at 652, but were also made to the appropriate officials who were in a position to redress the problem. (App.Ex.Supp.Defs.’ Mot. Summ.J., doc. no. 32, Ex. 4-5; App. Plf.’s Mem.Contra Defs.’ Mot.Summ.J., doc. no. 34, Ex. 24) These facts support a finding that plaintiffs speech was on a matter of public concern.
 
 See Zamboni,
 
 847 F.2d at 78.
 

 Reviewing the record as a whole, the Court finds that plaintiff has submitted sufficient evidence that his complaints reflected more than his purely personal interests. Therefore, the Court concludes that plaintiffs statements were on a matter of public concern.
 

 2.
 
 Balancing of interests
 

 As the Court has concluded that plaintiffs statements raised issues of public
 
 *395
 
 concern, the Court must now balance plaintiffs interest in expression on this matter with the interest of the state as an employer in promoting the efficiency of the public services it performs through its employees.
 
 See Watters,
 
 55 F.3d at 895. The state “bears the burden to justify a discharge, and that burden ‘varies depending upon the nature of the employee’s expression.’”
 
 Id.
 
 (quoting
 
 Connick,
 
 461 U.S. at 150, 103 S.Ct. at 1691) (other citation omitted).
 

 In the present case, defendants have identified no interests of the state as an employer adversely affected by the speech at issue. Defendants having failed to satisfy their burden, the Court concludes, therefore, that plaintiffs speech was speech protected by the First Amendment. Thus, defendants’ motion for summary judgment on counts I and III of the second amended complaint will be denied.
 

 B.
 
 Due Process Claims
 

 With regard to Count II, which alleges that defendants denied plaintiff of his liberty without due process in violation of 42 U.S.C. § 1983, as Plaintiff concedes, “the holdings of
 
 McDaniels v. Flick,
 
 59 F.3d 446 (3d Cir.1995) [,
 
 cert. denied,
 
 — U.S.-, 116 S.Ct. 1017, 134 L.Ed.2d 97 (1996) ] and
 
 Dykes v. SEPTA
 
 68 F.3d 1564 (3d Cir.1995) [,
 
 cert. denied,
 
 — U.S. -, 116 S.Ct. 1434, 134 L.Ed.2d 556 (1996) ] appear to preclude recovery because plaintiff had two post-denial avenues to redress the unfairness of the tenure decision: the appeal to the Faculty Senate Personnel Committee and the grievance and arbitration process.”
 
 [6]
 
 (Pl.’s Mem.Contra Defs.’ Mot. Summ.J., doe. no. 34 at 22) The Court finds that the facts of plaintiffs case fall within the scope of
 
 McDaniels
 
 and
 
 Dykes
 
 and, therefore, Count II of the second amended complaint will be dismissed.
 
 [7]
 

 C.
 
 Breach of Contract
 

 In Count IV of the second amended complaint, plaintiff alleges that in June 1992, he agreed to withdraw his tenure application in exchange for defendant Temple University’s promise that in 1993, he would receive “a fresh and fair [tenure] review which would follow the procedures outlined in the collective bargaining agreement and the faculty handbook.” (Plf.’s Mem.Contra Defs.’ Mot. Summ.J., doc. no 34 at 25; Second Am. Compl., doc. no. 12 at ¶ 108) Plaintiff contends that Temple breached this contract by failing to provide him with the “fresh and fair” review it agreed to. (Second Am. Compl., doc. no. 12 at ¶ 109)
 

 In considering plaintiffs breach of contract claim, the Court must first determine whether the contract here at issue existed independent of the collective bargaining agreement between Temple and TAUP, the exclusive bargaining agent for Temple’s faculty. If the contract did not so independently exist, plaintiffs contract, claim must be dismissed because under Pennsylvania law an employee has no right to sue his employer for breach of a collective bargaining agreement.
 
 [8]
 

 Zic
 
 
 *396
 

 cardi v. Commonwealth,
 
 500 Pa. 326, 330-32, 456 A2d 979, 981-82 (1982).
 

 The issue of whether under federal labor law an individual employee may enter into a contract with his employer, independent of a collective bargaming agreement in place between the exclusive bargaining agent and his employer, was considered by the Supreme Court in
 
 J.I. Case Co. v. National Labor Relations Board,
 
 321 U.S. 332, 339, 64 S.Ct. 576, 581, 88 L.Ed. 762 (1944). In that case, the Supreme Court concluded, “[w]e know of nothing to prevent the employee’s because he is an employee, making any contract provided it is not inconsistent with a collective bargaining agreement or does not amount to or result from or is not part of an unfair labor practice.” Relying by analogy upon the Supreme Court’s decision in
 
 J.I. Case Co.,
 
 plaintiff contends that, under Pennsylvania law, he and Temple were free to enter into the contract here at issue because the contract’s terms were “not inconsistent” with the collective bargaining agreement between Temple and TAUP.
 
 [9]
 

 (See
 
 Plf.’s Mem.Contra Defs.’ Mot.Summ.J., doc. no. 34 at 24-25 (quoting
 
 J.I. Case. Co.,
 
 321 U.S. at 339, 64 S.Ct. at 581)) Plaintiff recognizes, however, that if resolution of his contract claim requires interpretation of the Temple/TAUP collective bargaining agreement, then the claim is subject to the collective bargaining agreement’s grievance procedures and is, therefore, not properly before this Court.
 
 (See
 
 Plf.’s Mem.Contra Defs.’ Mot.Summ.J., doe. no. 34 at 27-28 (citing
 
 Adam v. Benjamin,
 
 426 Pa.Super. 543, 627 A2d 1186 (1993) (interpreting pre-emptive force of § 301 of the Labor Management Relations Act),
 
 appeal denied,
 
 537 Pa. 628, 642 A2d 482 (1994),
 
 and cert. denied,
 
 — U.S.-, 115 S.Ct. 92, 130 L.Ed.2d 43 (1994)))
 

 Following plaintiffs own analysis, his contract claim must be dismissed. Plaintiff contends that his contract with Temple was for “a fresh and fair [tenure] review which would follow the procedures outlined in the collective bargaining agreement and the faculty handbook.”
 
 [10]
 
 (Plf.’s Mem.Contra Defs.’ Mot.Summ.J., doc. no 34 at 25) The Court can not possibly analyze whether this alleged contract was breached absent interpretation of the Temple/TAUP collective bargaining agreement. Proper resolution of plaintiffs claim was, therefore, left to the collective bargaining agreement’s grievance procedures.
 

 As noted previously, plaintiff requested that TAUP submit his grievance to arbitration. TAUP’s refusal to honor this request, however, did not give plaintiff the “unfettered right” to sue his employer.
 
 See Ziccardi,
 
 500 Pa. at 332, 456 A2d at 981-82. In the absence of an allegation of collusion between TAUP and Temple, not present here,
 
 *397
 
 plaintiffs remedy was a state court action against TAUP for breach of its fiduciary duty to represent him.
 
 See Id.
 
 at 330-32, 456 A2d at 981-82. Count TV of the second amended complaint will, therefore, be dismissed.
 
 [11]
 

 D.
 
 Defamation
 

 Count V of the second amended complaint, alleging defamation, will also be dismissed. The statements made by defendants in the course of plaintiffs 1993 tenure evaluation which were repeated to the Faculty Senate Personnel Committee in February 1994, cannot support a claim for defamation because these statements were made with plaintiffs consent and, therefore, under Pennsylvania law they are absolutely privileged.
 
 Baker v. Lafayette College,
 
 350 Pa.Super. 68, 504 A.2d 247 (1986) (appellant college professor’s consent to publication of formal evaluations of his performance gave appellee college absolute privilege against professor’s defamation claim),
 
 affd on other grounds,
 
 516 Pa. 291, 532 A.2d 399 (1987). This absolute privilege applies even if the statements were made with “ill will, negligence or actual malice (knowledge of or recklessness as to falsity).”
 
 Id.
 
 504 A.2d at 250 (citations omitted);
 
 see Agriss v. Roadway Express, Inc.,
 
 334 Pa.Super. 295, 483 A.2d 456, 463 (1984) (one who publishes defamatory matter within scope of an absolute privilege is immune from liability regardless of occasion or motive) (citing
 
 Sciandra v. Lynett,
 
 409 Pa. 595, 187 A.2d 586 (1963));
 
 Yetter v. Ward Trucking Corp.,
 
 401 Pa.Super. 467, 585 A.2d 1022, 1024 (same),
 
 appeal denied,
 
 529 Pa. 623, 600 A2d 539 (1991).
 

 Plaintiff admits that he “consented to the review by the Faculty Senate Personnel Committee of his tenure review file.” (Pl.’s Mem.Contra Defs.’ Mot.Summ.J., doc. no. 34 at 30) However, plaintiff argues that the
 
 Baker
 
 case, where the Superior Court held that the faculty member’s consent to the evaluation process cloaked statements made in connection with that process with absolute privilege, although affirmed by the Pennsylvania Supreme Court, was not affirmed on the ground of privilege, but instead on the ground that the statements there at issue were not capable of defamatory meaning.
 
 (Id.
 
 at 29-30) Therefore, according to plaintiff,
 
 Baker
 
 is not the law of Pennsylvania on the availability of absolute privilege to defendants.
 
 (Id.)
 

 Although plaintiff is correct that a ruling of the Superior Court is not binding on this Court, simply because the Pennsylvania Supreme Court did not reach the absolute privilege issue in
 
 Baker
 
 does not mean that the Superior Court’s ruling is stripped of all value. “In the absence of guidance from the state’s highest court, we are to consider decisions of the state’s intermediate appellate courts for assistance in predicting how the state’s highest court would rule.”
 
 Gares v. Willingboro Township,
 
 90 F.3d 720, 725 (3d Cir.1996) (citation omitted);
 
 see Rolick v. Collins Pine Co.,
 
 925 F.2d 661, 664 (3d Cir. 1991) (in predicting state law, federal court cannot disregard decision of state’s intermediate appellate court unless convinced that state’s highest court would rule otherwise). Additionally, although the Pennsylvania Supreme Court has yet to speak to the issue, other courts in Pennsylvania, both state and federal have recognized that an absolute privilege based on consent currently exists in Pennsylvania.
 
 See Johnson v. Resources for Human Development, Inc.,
 
 860 F.Supp. 218, 222 (E.D.Pa.1994) (absolute privileges are granted by consent);
 
 Frymire v. Painewebber, Inc.,
 
 87 B.R. 856, 859 (Bankr.E.D.Pa. 1988) (same);
 
 Miketic v. Baron,
 
 450 Pa.Su
 
 *398
 
 per. 91, 675 A.2d 324, 328 (1996) (same).
 
 [12]
 
 The Court finds these decisions persuasive and plaintiff has not argued convincingly why they should not be followed.
 
 [13]
 
 Therefore, Count V of the second amended complaint will be dismissed.
 

 IV. CONCLUSION
 

 As no genuine issues of material fact remain with regard to plaintiffs due process, contract and defamation claims, counts II, IV and V of the second amended complaint are dismissed. Counts I and III of the second amended complaint, containing plaintiffs claims that defendants retaliated against him for his exercise of his right to free speech will proceed to trial.
 

 An appropriate order shall be entered.
 

 [1]
 

 . This version of the facts is taken from plaintiff's second amended complaint and plaintiff's memoranda in opposition to defendants' motion for summary judgment along with the exhibits submitted therewith, and is viewed in the light most favorable to plaintiff.
 
 See infra
 
 Section II. While for purposes of this motion the facts asserted by plaintiff in the above referenced documents are deemed true, the recitation of facts in this section of the Court’s opinion does not constitute findings of fact by the Cotut.
 

 [2]
 

 . According to plaintiff the lab contained hundreds of scattered unidentified materials, a layer of unidentified metal dust covering all surfaces, exfoliated Thallium powder wrapped in a crumbling napkin and large quantities of cyanide and other toxins stored on open shelves. (Plf.’s Counterstatement of Facts, doc. no. 34 at 4 n. 10) Plaintiff also contends that the lab had a badly leaking roof and unsecured rubber water tubing above and around electrical equipment, improperly cut asbestos room partitions and a visibly loose asbestos sieve, a tom and burnt tile floor, electrical wiring with visible damage to the cable insulation hung from the asbestos partitions and an excessive amount of inoperable equipment, old furniture and dozens of cardboard boxes which obstructed free passage through the laboratory and created a fire hazard.
 
 (Id.
 
 at 4-5 n. 10)
 

 [3]
 

 . The P & P Committee voted in favor of plaintiff’s tenure by a margin of four votes to two. The Departmental Tenure Committee unanimously voted in favor of plaintiff’s tenure. (Plf.’s Counterstatement of Facts, doc. no. 34 at 13)
 

 [4]
 

 . The plaintiff in
 
 Smith
 
 averred "I don't speak for anyone else other than myself,” and "I’m a non-smoker and I’m a runner, and I don’t appreciate having to inhale other people’s carcinogen's.”
 
 Smith, 28
 
 F.3d at 648, 651-52.
 

 [5]
 

 . As a result of plaintiff's actions, the entire fourth floor of Barton Hall, including the physics lounge was closed, renovations to the area were halted, an outside contractor was called in to identify and dispose of the chemicals located there and the union representing the university faculty wrote to the university’s vice president to express its concern over Barton Hall’s safely.
 
 (See
 
 App.Plf.’s Mem.Contra Defs.’ Mot.Summ.J., doc. no. 34, Ex. 19-21, 27)
 

 [6]
 

 .
 
 McDaniels
 
 involved the claim of a tenured professor discharged for sexual harassment who alleged that his procedural due process rights were violated. In reversing the district court’s order denying the defendant college's motion for judgment as a matter of law, the Third Circuit held that "a discharged employee cannot claim in federal court that he has been denied due process because his pretermination hearing was held by a biased individual where he has not taken advantage of his right to a post-deprivation hearing before an impartial tribunal that can rectify any possible wrong committed by the initial decision maker.”
 
 McDaniels,
 
 59 F.3d at 460. Similarly, in
 
 Dykes
 
 the Third Circuit found, "[wjhere a due process claim is raised against a public employer, and grievance and arbitration procedures are in place, we have held that those procedures satisfy due process requirements ‘even if the hearing conducted by the Employer
 
 ...
 
 [was] inherently biased.’ ”
 
 Dykes,
 
 68 F.3d at 1571 (quoting
 
 Jackson v. Temple University,
 
 721 F.2d 931 (3d Cir.1983)). As stated above, plaintiff concedes that he had two post-denial avenues through which he could seek to redress the adverse tenure decision. Under
 
 McDaniels
 
 and
 
 Dykes,
 
 therefore, plaintiff’s due process claim must fail.
 

 [7]
 

 . The Court notes that at the time defendants’ motion to dismiss was ruled upon by Judge Rendell, the judge to whom this case was originally assigned, the Third Circuit had not yet filed its opinions in
 
 Dykes
 
 and
 
 McDaniels. See Bloch v. Temple Univ.,
 
 1995 WL 263541 (E.D.Pa. May 1, 1995).
 

 [8]
 

 . Although an employee may not file suit against his employer for breach of a collective bargaining agreement, the bargaining agent, on behalf of
 
 *396
 
 the employee, may dispute the employer’s actions under a collective bargaining agreement. In such an instance, Section 903 of Pennsylvania's Public Employee Relations Act ("PERA”), 43 P.S. § 1101.903, sets forth the appropriate remedy. Section 903 provides as follows:
 

 Arbitration of disputes or grievances arising out of the interpretation of the provisions of a collective bargaining agreement is
 
 mandatory.
 
 The procedure to be adopted is a proper subject of bargaining with the proviso that the final step shall provide for a binding decision by an arbitrator or a tri-partite board of arbitrators as the parties may agree.
 

 43 P.S. § 1101.903 (emphasis added).
 

 [9]
 

 . Plaintiff seeks to escape the mandatory language of PERA's Section 903 by arguing that his alleged 1992 contract with Temple for a "fresh and fair” tenure review entitled him to a tenure evaluation that was somehow conceptually different from, yet at the same time "not inconsistent" with the tenure evaluation the Temple/TAUP collective bargaining agreement provides for.
 
 (See
 
 Plf.’s Mem.Contra Defs.' Mot.Summ.J., doc. no. 34 at 24-26) Plaintiff’s argument is without merit. Plaintiff has proffered no evidence that Temple’s alleged contract to provide him with a “fresh and fair” review amounted to anything more than a promise by Temple that it would conduct plaintiff's tenure evaluation anew, in accordance with the procedures set forth in the collective bargaining agreement, in 1993. Thus, under Pennsylvania law plaintiff was required to pursue his claim through the grievance and arbitration procedures for which the collective bargaining agreement between Temple and TAUP provides.
 

 [10]
 

 . Plaintiff concedes that his tenure review was governed by the terms of the collective bargaining agreement in place between Temple and TAUP. (See Plf.’s Mem.Contra Defs.' Mot. Summ.J., doc. no. 34 at 25) As required by section 903 of PERA, therefore, it is "mandatory” that disputes or grievances arising out of plaintiff’s tenure review be the subject of the grievance procedure. See supra notes 8 & 9.
 

 [11]
 

 . The Court notes that Judge Rendell’s previous ruling against defendants on defendants' motion to dismiss plaintiff’s contract claim does not preclude dismissal of plaintiff's contract claim at this time. In ruling on defendants’ motion to dismiss, the issue before Judge Rendell was whether plaintiff had stated a contract claim. Here, at the summary judgment stage, however, the question to be decided is whether upon review of all the evidence in the light most favorable to plaintiff, a genuine issue of material fact exists with regard to plaintiff's contract cause of action.
 
 See supra
 
 Section II. As the Court finds that no such genuine issue of material fact is present and that defendants have shown their entitlement to judgment as a matter of law, defendants’ motion for summary judgment on count IV of plaintiff's second amended complaint will be granted.
 

 [12]
 

 . In
 
 Miketic,
 
 a physician who had been terminated from her position at a university hospital brought a defamation action against her immediate supervisor and department chairman based on a letter which had been sent to the chairman by the supervisor negatively evaluating her performance. Upon review of the case law, including its decision in
 
 Baker,
 
 the Superior Court concluded that there was "certainly a strong argument in favor of finding that [defendants] had an absolute privilege to publish the letter at issue,” but declined to reach the absolute privilege question because it determined that a conditional privilege applied which had not been abused.
 
 Miketic,
 
 675 A.2d at 329-31. Unlike the present case where plaintiff admits that he consented to the publication of the statements at issue, the Superior Court in
 
 Miketic
 
 found nothing “to indicate that [the plaintiff there] consented to such a publication/evaluation.”
 
 Id.
 
 at 328.
 

 [13]
 

 . The Court notes that an absolute privilege can be lost if the defamatory statements are published to an unauthorized party.
 
 See Miketic,
 
 675 A.2d at 327. Plaintiff does not contend that the statements at issue here were so published.