**Tony I. LOWE, Plaintiff,**

v.

**AMERIGAS, INC., Defendant.**

**No. 3:96CV2376(GLG)**

United States District Court, D. Connecticut.

June 7, 1999.

Ronald E. Lasky, Ronald E. Lasky & Associates, New London, CT, for plaintiff.

Stephen B. Harris, Wiggin & Dana, Hartford, CT, Stephen W. Aronson, Farmington, CT, Susan K. Krell, James F. Shea, Jackson, Lewis, Schnitzler & Krupman, Hartford, CT, Kevin A. Randolph, Hartford, CT, Michael L. Banks, Morgan, Lewis & Bockius LLP, Philadelphia, PA, for defendant.

Kevin A. Randolph, Hartford, CT, for movants.

## OPINION

GOETTEL, District Judge.

This is a diversity case in which the plaintiff, Tony I. Lowe, asserts six state-law claims against his former employer, AmeriGas, Inc., arising out of the termination of his employment. Defendant moves for summary judgment on all counts of plaintiff's complaint [**Doc. # 32**].

### SUMMARY JUDGMENT STANDARD

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the moving party is entitled to judgment as a matter of law.

Rule 56(c), Fed.R.Civ.P.; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden rests with the moving party to show that there exists no genuine dispute about an issue of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The substantive law governing the case identifies those facts that are material. *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. 2505. A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.1992).

After discovery, if the nonmoving party has failed to make a sufficient showing on an essential element of his case as to which he has the burden of proof, then summary judgment is appropriate. In ruling on a motion for summary judgment, the Court is required to resolve all ambiguities in the record and to draw all reasonable inferences in favor of the nonmoving party. *Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. 2505. Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991).

### BACKGROUND

AmeriGas is in the business of providing propane gas and servicing propane gas systems in residential, commercial, industrial, and agricultural applications. Propane is classified as a hazardous material by the United States Department of Transportation ("DOT") and is regulated by the DOT Office of Pipeline Safety ("OPS"), the DOT Federal Highway Administration ("FHA"), and the Connecticut Department of Public Utility Control ("DPUC").

Plaintiff was employed by AmeriGas from May 19, 1995,[1] to February 1, 1996,

as the District Manager for the Killingworth and Waterford, Connecticut districts. Plaintiff had been recruited by C. Stephen Sheffield, Area Manager of AmeriGas, to correct existing problems concerning safety and employee production, attitudes, and training. As the District Manager, plaintiff's job duties included ensuring the safety of all propane installations in his district, pricing, customer service, and ensuring compliance with state and federal regulations. Plaintiff's immediate supervisor was Joseph Gasparino, the Market Manager responsible for safety in all of the districts.

On May 19, 1995, at the time of his hire, plaintiff signed an Employee Acknowledgement, which provided in relevant part:

> On the date indicated below, I received a copy of the Company's Human Resources Policies and Benefit Summary which I understand is a general statement of the policies and benefits and a general overview of the responsibilities and obligations of employees.

> I acknowledge that this information does not constitute a contract between the Company and any of its employees, including myself. I further recognize that my employment relationship with the Company is based on the concept of employment-at-will and as such I may terminate my employment at any time with or without cause, with or without notice and the Company may do the same.

The Human Resources Policies handbook included a discussion of employment-at-will on page one of the booklet, which, after a large heading in boldface type "Employment–At–Will," stated:

> The concept of employment-at-will has always been the basis for the employment relationship between the Company and its employees. Recent legal trends

---

1. There is some discrepancy as to the date of plaintiff's hire, whether it was May 1st, May 19th, or May 30th. It appears that plaintiff filled out an employment application on May 19th and began working on May 30th. The exact dates are unimportant for purposes of this Motion.

make it necessary to restate that policy here. Employees of the Company are hired on an at-will basis, meaning that employees are hired for an indefinite term and that either party, the employer or the employee, may terminate the employment relationship at any time, with or without cause.

No representative of the Company, including its officers, has any authority to make any agreement contrary to the foregoing. No policies, procedures or practices by their use change the policy of employment-at-will as the basis of the employment relationship . . . . .

Additionally, the Policies handbook discussed "Disciplinary Action" and set forth as a "guideline only" a four-step course of action that a supervisor would generally pursue. First, the employee would be told the items that require attention for correction or improvement; second, the employee would be counseled as to what must be done; third, a reasonable time-frame for improvement would be established and the employee's performance during that period would be evaluated; and fourth, the employee would be told the outcome if the problem were not corrected (e.g., reassignment, time off, termination). (Human Resources Policies at 4). The handbook pointed out that each disciplinary action would be analyzed in the context of the particular circumstances, considering factors such as the nature of the policy, the responsibilities associated with the employee's position, the nature of the conduct, the employee's prior work record, and other circumstances related to the disciplinary action. *Id.* at 4–5. With respect to terminations, the handbook stated as to "voluntary terminations" that the company would continue its commitment to treat employees with respect and fairness and asked for the same in return from the employees. As to "involuntary terminations," the handbook stated that they "may occur when the Company believes it is in the Company's best interest to terminate employment. This may occur for a variety of reasons such as employee ac-

tions, business conditions, reorganization, shifting of work or other similar conditions, etc." *Id.* at 5.

AmeriGas contends that soon after plaintiff commenced his employment he began violating safety policies and governmental regulations, committing acts of insubordination, mistreating customers and employees, and driving trucks over a certain tonnage which he was not permitted to do. Defendant maintains that all of these acts led to his termination. In particular, defendant focuses on two incidents where plaintiff allegedly violated safety regulations.

The first was plaintiff's failure to remove two temporary propane tanks from the Fashion Plaza parking lot in Groton, Connecticut, a retail mall serviced by defendant. These temporary tanks had been installed in the parking lot in November 1995 to allow the repair of the main gas tank located on the shopping center roof, which had been damaged by workmen doing roofing repairs. However, because of their temporary nature, the tanks were not "crash protected" and posed a safety hazard if hit by a driver in the parking lot. Defendant claims that plaintiff promised the fire marshal that these tanks would be removed in two days. However, on January 29, 1996, one of their service technicians learned from the fire marshal that the tanks had not been removed and unless they were removed immediately, the mall would be closed down because of safety concerns. This was reported to Mr. Gasparino, plaintiff's boss, who states that he directed the service technician to go to the site and remove them immediately, but plaintiff allegedly countermanded this order. Plaintiff responds that the tanks were installed at the direction of the fire marshal and, although plaintiff consented to the project to repair the piping on the roof, he never promised to remove the tanks within two days. He states that he "dedicated" his employees to work on the Fashion Plaza problem until the weather

became so cold and icy that it was too dangerous for the men to work on the roof to perform the repairs. Plaintiff further denies that he countermanded Mr. Gasparino's orders.

The second incident was plaintiff's failure to complete an Emergency Action Plan for Olde Mystic Village, a shopping development and customer of AmeriGas. The Emergency Action Plan was required by DPUC. It had been started by plaintiff's predecessor but never completed. Plaintiff states that he was not aware that this plan needed to be done until just before he was terminated, at which time he had just obtained the schematic that he needed to complete the plan. On January 29, 1996, the DPUC sent a "Preliminary Notice— Probable Non–Compliance" to the President of AmeriGas regarding eight possible regulatory violations in Olde Mystic Village. Defendant maintains that the failure to make the corrections required by DPUC could result in the company's losing its ability to do business in Connecticut.

Defendant also cites to plaintiff's failure to maintain DOT transportation files for AmeriGas' drivers and his failure to respond to DMV notices.[2] Throughout December, plaintiff was sent notices regarding items missing from employees' DOT qualification files. Plaintiff also received a notice from the Department of Motor Vehicles notifying plaintiff of eleven violations identified on an AmeriGas vehicle. According to defendant, plaintiff did not respond to these notices. On December 15, 1995, plaintiff was given physical deficiency reports for two delivery representatives in his district, as well as license deficiency reports showing workers whose licenses were deficient. It was plaintiff's responsibility to correct these deficiencies, which he failed to do in a timely manner. Defendant maintains that plaintiff's failure to address these notices and deficiency reports jeopardized the company's ability

to do business. Plaintiff responds that he did correct whatever problems were brought to his attention.

Defendant also cites to numerous customer complaints arising from plaintiff's districts in which customers alleged that he had acted unprofessionally and discourteously and had failed to respond to calls from an inspector from the Connecticut Department of Consumer Protection, investigating two customer complaints. After becoming aware of several such incidents, Mr. Gasparino states in his affidavit that he began documenting these complaints and recites eight different incidents involving customer complaints. Mr. Gasparino also lists eleven different complaints that he received from employees regarding plaintiff, such as plaintiff's yelling obscenities at an employee, referring to an employee as a "liar," telling employees that it was "his way or no way," failing to advise employees of scheduled service yet complaining about their productivity, yelling at employees, and treating employees inconsistently depending on whether he liked them or not. Mr. Gasparino further stated in his affidavit that he had witnessed plaintiff driving trucks that he was not authorized to drive because of the weight of the vehicles and the propane that was carried. There was also an incident involving a new account plaintiff opened at below normal prices, without any justification. All of these incidents, defendant contends, led to plaintiff's discharge.

Plaintiff counters that from the beginning of his employment he observed and reported unsafe company practices that violated governmental regulations, such as thousands of improperly-stored, full propane cylinders left in the yard by AmeriGas employees, an employee installing a large tank that had not been recertified. Plaintiff contends that he undertook to correct these practices and reported his

---

**2.** DOT regulations require that each service technician and delivery representative have a complete Driver Qualification File in order to drive a vehicle over a certain weight class containing minimum quantities of propane.

concerns regarding safety, employee production, employee attitudes and employee training to his supervisors and other managers at AmeriGas. As for defendant's complaints regarding his performance, plaintiff responds that these were either unfounded or unjustified and they arose as a direct result of, and in retaliation for, his attempts to address serious safety issues with management. He also states that the customer complaints came to him as the District Manager, but that did not necessarily concern his performance.

On February 1, 1996, plaintiff was called into Mr. Gasparino's office, where Penny Zimmerman from Human Resources and Mr. Sheffield were also present. Ms. Zimmerman informed plaintiff that he was being terminated for safety reasons, insubordination, customer complaints, and employee complaints. (Pl.'s depo. at 89). After advising plaintiff that he was being terminated, they called a cab for plaintiff and sent him home. (Pl.'s depo. at 94).

Plaintiff testified in his deposition that he thought his firing was a "personal issue ... a personal thing" (Pl.'s depo. at 94, 226) between him and Mr. Gasparino because they had both applied for the same position and, once Mr. Gasparino got the job, he started to be confrontational with plaintiff. (Pl.'s depo. at 95). Mr. Gasparino testified that, although it was normally his policy to counsel employees before disciplining them, in the case of plaintiff, the Fashion Plaza incident—"the insubordination"—caused him to terminate plaintiff on the spot. (Gasparino depo. at 134). He also admitted that he did not take into consideration the good things that plaintiff had accomplished while employed by AmeriGas. (Gasparino depo. at 171). He only considered the bad things. (Gasparino depo. at 171).

After his termination, plaintiff received a letter from Human Resources dated February 16, 1996, outlining the reasons for his termination, which included "[m]ajor violations of AmeriGas' safety policies and government regulations," and insubordination. The letter stated that given plaintiff's "relatively short tenure with the company, ongoing problems with customers and employees, and serious violations of government regulations and company policy, non-compliance and insubordination, AmeriGas had no other choice but to terminate your employment."

Plaintiff states in his affidavit that Mr. Sheffield had reassured him, at the time he was hired, that if the company had complaints about his job performance, he would be given the opportunity to rebut these concerns before any disciplinary action was taken against him. He also maintains that it was his understanding based upon representations made to him that he would not be subject to adverse action for reporting improper conduct to management or reporting safety concerns. Plaintiff also points to the allegedly inequitable manner in which defendant enforced its safety policies, pointing to the fact that he, who had never been responsible for a gas explosion, was terminated, whereas other employees, including his supervisor, had caused gas explosions but were not terminated.

On October 25, 1996, plaintiff filed the instant action in Superior Court for the Judicial District of New London, Connecticut.[3] The complaint was removed to federal court, and on December 30, 1996, plaintiff filed an amended complaint, iden-

**3.** On February 26, 1996, plaintiff filed a race discrimination complaint with the Connecticut Commission on Human Rights and Opportunities ("CCHRO") and the Equal Employment Opportunity Commission ("EEOC"). He obtained a Release of Jurisdiction from the CCHRO on December 18, 1996, and on August 7, 1997, the EEOC issued its Right–to–Sue Notice indicating that it was closing its file because plaintiff was pursuing his claim in another forum. We do not know whether plaintiff is pursuing his discrimination complaint in another forum; however, he has not pursued a race discrimination claim in this complaint.

tical to the first except that it added a demand for a jury trial.

## DISCUSSION

In his complaint, plaintiff asserts six causes of action against AmeriGas arising out of his termination: breach of an express oral contract (Count One); breach of an implied oral contract (Count Two); wrongful discharge in violation of his right to freedom of speech, Conn.Gen.Stat. § 31–51q (Count Three); violation of Connecticut's Whistleblower Statute, Conn. Gen.Stat. § 31–51m (Count Four); negligent misrepresentation (Count Five); and negligent infliction of emotional distress (Count Six). Defendant seeks summary judgment in its favor on all six counts.

### I. Breach of Express and Implied Oral Contract (Counts One and Two)

Plaintiff does not claim to have had a written contract with defendant. Instead, in his first two counts, he asserts that an oral contract arose as a result of defendant's representations that he would not be discharged except for cause, that he would only be discharged for reasons which were fair, that he would be permitted to operate the Waterford and Killingworth facilities safely and in conformance with law, and that if defendant had complaints about his job performance, he would be given an opportunity to rebut these complaints before any disciplinary actions were taken against him. (Pl.'s Compl. ¶ 5).

"A contract implied in fact, like an express contract, depends on actual agreement." *D'Ulisse–Cupo v. Board of Directors of Notre Dame High School*, 202 Conn. 206, 211 n. 2, 520 A.2d 217 (1987). Accordingly, to survive a motion for summary judgment, the plaintiff has the burden of presenting evidence that the defendant had agreed to some form of contractual commitment, either by words or action or conduct. *Reynolds v. Chrysler First Commercial Corp.*, 40 Conn.App. 725, 729–30, 673 A.2d 573,

*cert. denied*, 237 Conn. 913, 675 A.2d 885 (1996); *Burnham v. Karl and Gelb, P.C.*, 50 Conn.App. 385, 388, 717 A.2d 811, *cert. granted in part*, 247 Conn. 944, 723 A.2d 320 (1998). In this case, plaintiff must show that defendant agreed not to discharge him except for cause and only after plaintiff had an opportunity to rebut the complaints against him, *i.e.* after notice.

The primary difficulty we have with plaintiff's position is that it is undisputed that plaintiff executed a written acknowledgement that he was an at-will employee, meaning he could be discharged with or without cause. Indeed, plaintiff admits that fact in his surreply. (Pl.'s Surreply at 2). Plaintiff also admits that he received a copy of the company's Human Resources Policies which clearly spelled out that he could be terminated without cause and without notice. The written policy statement further stated specifically that no representative of the company had the authority to make an agreement to the contrary. The representations by Mr. Sheffield on which plaintiff relies are not necessarily contrary to the general guidelines set forth in the Human Resources Policies; even if they were, Mr. Sheffield did not have the authority to change these policies and plaintiff was put on notice of this fact. Plaintiff has provided us with no evidence of a contractual agreement by defendant to discharge him only for cause or only after notice.

In *Burnham, supra*, the court affirmed the grant of summary judgment on the plaintiff's implied contract claim, where she alleged that, at the time she was hired, defendants had represented to her that they would evaluate her performance according to certain performance expectations and goals and that she would only be terminated for cause. Based upon the plaintiff's deposition testimony in which she acknowledged that she was never told that she could be fired only if she did something wrong and that no perfor-

mance goals were ever set for her, the court found that there was no meeting of the minds between plaintiff and defendant regarding the existence of an employment contract. The court held, "[a] contractual promise cannot be created by plucking phrases out of context; there must be a meeting of the minds between the parties." *Burnham,* 50 Conn.App. at 389, 717 A.2d 811 (internal quotations and citations omitted). In order to support contractual liability, the defendant's representations must be sufficiently definite to manifest a present intention to undertake an immediate contractual obligation to the plaintiff. *Id.* (quoting *D'Ulisse–Cupo,* 202 Conn. at 214–15, 520 A.2d 217). In *Reynolds, supra,* the court upheld summary judgment in favor of the employer where the employee alleged that the employer's regular use of progressive discipline policies gave rise to an implied contract. The court held that the employee's understanding as to those policies was insufficient evidence of the formation of a contract. There must be evidence that the employer intended to be bound to such a contract. 40 Conn.App. at 730–31, 673 A.2d 573. In *Barbuto v. William Backus Hospital,* No. 105452, 1995 WL 235068, *4 (Conn.Super.Apr.13, 1995), the court held that the defendant's representations that an employee's position would never be taken away and that she could have the position for as long as she wanted it were insufficient to establish an immediate intention by the defendant to undertake contractual commitment toward the plaintiff.

■ Based upon this authority and the lack of any evidence of a contractual commitment by defendant, we hold that plaintiff has not established the existence of an express or implied oral contract. We hold, instead, that plaintiff was an at-will employee, who could be terminated with or without cause and with or without notice. That being so, it is unnecessary for us to resolve the discrepancies between the parties' positions on the events that transpired during plaintiff's tenure with the company and that allegedly led to his termination.

Plaintiff urges this Court to "adopt a standard which protects employees from the unfair practices of employers. For instance, this court should deem invalid disclaimers which an employer requires an employee to sign upon hiring since the employee has no real choice but to sign or face the possibility of not being hired." (Pl.'s Mem. of Law in Opposition to Def.'s Mot. for Summary Judgment at 12). This the Court cannot do. As a federal court sitting in diversity, this Court's must apply the substantive law of the State of Connecticut. Connecticut courts have not recognized a common-law cause of action based solely upon "unfair" employment practices.

Plaintiff takes a different approach in his surreply. Acknowledging that the traditional rule in Connecticut is at-will employment may be terminated by either party without regard to cause, he cites to the narrow public policy exception to this general rule recognized by Connecticut courts in *Carbone v. Atlantic Richfield Co.,* 204 Conn. 460, 528 A.2d 1137 (1987), *Magnan v. Anaconda Industries, Inc.,* 193 Conn. 558, 479 A.2d 781 (1984), and *Faulkner v. United Technologies Corp.,* 240 Conn. 576, 693 A.2d 293 (1997). (Pl.'s Surreply at 2–3, stating "Plaintiff is simply claiming that he comes within the narrowly defined exception as is set forth in *Carbone* ").

The Connecticut Supreme Court has indeed recognized a public policy limitation on the traditional employment-at-will doctrine. *Sheets v. Teddy's Frosted Foods, Inc.,* 179 Conn. 471, 480, 427 A.2d 385 (1980); *Parsons v. United Technologies Corp.,* 243 Conn. 66, 76–77, 700 A.2d 655 (1997). That theory of recovery, however, is different than the oral contract claims asserted by plaintiff in Counts One and Two of the complaint. In neither Count One nor Count Two does plaintiff allege

that his discharge violated public policy.[4] Even in his surreply, where he first raises this new theory of recovery, he never alleges that his discharge violated an explicit statutory or constitutional provision or a judicially conceived notion of public policy. *See Morris v. Hartford Courant Co.,* 200 Conn. 676, 680–81, 513 A.2d 66 (1986).

In Count Three, discussed *infra,* plaintiff does allege that his discharge was in retaliation for exercising his constitutional rights under the First Amendment in violation of Conn.Gen.Stat. § 31–51q, and in Count Four, he alleges his discharge violated Connecticut's Whistleblower Statute, Conn.Gen.Stat. § 31–51m. In *Atkins v. Bridgeport Hydraulic Co.,* 5 Conn.App. 643, 648, 501 A.2d 1223 (1985), the court limited the circumstances under which an employee can bring a common-law cause of action for wrongful discharge to those cases in which the employee would otherwise be without a remedy. *See also Skorupski v. United Business and Industry Federal Credit Union,* No. CV 980488029S, 1999 WL 171432, *5 (Conn.Super.Mar.9, 1999). This requirement recognizes the narrowness of the public policy exception to traditional "at-will" employment and the repeated admonition of the Connecticut Supreme Court that "the courts should not lightly intervene to impair the exercise of managerial discretion or to foment unwarranted litigation." *Parsons,* 243 Conn. at 79, 700 A.2d 655 (internal citations and quotations omitted).

Therefore, even if we were to rely on plaintiff's allegations in Count Three or Four, plaintiff still would not have a common-law cause of action for wrongful discharge because he could assert this claim, as he has done, under Conn. Gen.Stat. § 31–51q or § 31–51m. Accordingly, finding that there was no oral employment contract between the parties modifying plaintiff's employee-at-will status, and finding that plaintiff has not alleged the violation of a state or federal statute or public policy in connection with his termination for which he does not otherwise have a remedy, we grant summary judgment in favor of defendant on Counts One and Two of plaintiff's complaint.

## II. Wrongful Discharge in Violation of Conn.Gen.Stat. § 31–51q (Count Three)

In his third count, plaintiff alleges that he was discharged in retaliation for exercising his constitutional right of free speech when he expressed to defendant his concerns about safety, customer service and employee attitudes, about employee racial remarks and plaintiff, about inventory control problems, about training and safety, about safety regarding the installation at Mystic Village, and about the condition of the districts that existed because of the lack of care and concern of previous management.[5] Plaintiff maintains that his speech was protected because it addressed safety violations and training and that he

---

4. Plaintiff alleges that defendant "discharged the plaintiff without cause unfairly because he reported safety and inventory control violations to Bill Russell" (Compl.¶ 9); that "defendant's actions ... violated Plaintiff's oral contract with the Defendant because plaintiff was discharged in violation of the oral contract and promises . listed [above]" (Compl.¶ 12); and that "Defendant violated [the promise to let plaintiff operate the facilities safely] by refusing to permit the Plaintiff from doing so and by discharging him" (Compl.¶ 13).

5. For example, on November 20, 1995, plaintiff responded to an audit of the Killingworth

district in a memorandum to the Vice President of the Northeast Region in which he states:

This district has had years of neglect in its management. The administrative problems are a result of training, commitment, and turn over. The safety problems are *explosive*. Prior to my arrival, the plant and the equipment could have been rendered inoperable by the appropriate government agencies. Since then, we have eliminated many of the safety problems.... Plaintiff documented his concerns regarding safety and training on several other occasions, requesting assistance with both, but receiving no help or feedback.

was discharged in retaliation for this speech. (Pl.'s Mem. in Opposition to Def.'s Mot. for Summary Judgment at 17).

■ In order to demonstrate a violation of section 31–51q, Conn.Gen.Stat., plaintiff must prove that: (1) he was exercising rights protected by the first amendment to the United States Constitution (or an equivalent provision of the Connecticut Constitution); (2) he was fired on account of his exercise of such rights; and (3) his exercise of his first amendment (or equivalent state constitutional rights) did not substantially or materially interfere with his bona fide job performance or with his working relationship with his employer. *Winik–Nystrup v. Manufacturers Life Ins. Co.*, 8 F.Supp.2d 157, 159 (D.Conn. 1998); *Williams v. Bayer Corp.*, 982 F.Supp. 120, 123 (D.Conn.1997).

■ Defendant argues that the content of plaintiff's speech was not constitutionally protected and, therefore, does not fall within the protections of this statute. To be protected by the first amendment, plaintiff's speech must have been on a matter of public concern, and plaintiff's interest in expressing himself on the particular matter must not have been outweighed by any injury the speech could cause to the employment relationship. *Waters v. Churchill*, 511 U.S. 661, 668, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (brought under 42 U.S.C. § 1983); *Cotto v. United Technologies Corp.*, 48 Conn.App. 618, 630, 711 A.2d 1180, *cert. granted in part*, 245 Conn. 915, 717 A.2d 233 (1998).[6]

■ In this case, plaintiff states that he spoke to his employer about his con-

cerns over safety issues, customer service and employee attitudes, racial remarks made by other employees, inventory control problems, training and safety, and safety concerns at the installation at Mystic Village. Plaintiff's opinions on customer service, employee attitudes, racial remarks by other employees, inventory control problems, and training clearly related to matters between plaintiff and AmeriGas and were not matters of public concern. *See Emerick v. Kuhn*, 52 Conn. App. 724 (1999); *Urashka v. Griffin Hosp.*, 841 F.Supp. 468, 474–75 (D.Conn. 1994); *Cotto, supra.* These complaints were made by plaintiff in his role as an employee, not as a concerned citizen. Plaintiff's complaints about safety concerns regarding the improper storage of a hazardous substance such as propane, however, implicate matters of public concern and, thus, constitute protected speech. *See Mirto v. Laidlaw Transit, Inc.*, No. 334231, 1993 WL 137627 (Conn.Super.Apr.20, 1993); *Olson v. Accessory Controls & Equipment Corp.*, No. CV 93–0525839 S, 1994 WL 60050 (Conn.Super.Feb.15, 1994); *see also Considine v. Board of County Comm'rs*, 910 F.2d 695, 701 (10th Cir.1990) (First Amendment case); *Robinson v. Balog*, 160 F.3d 183, 188 (4th Cir.1998); *Bloch v. Temple Univ.*, 939 F.Supp. 387, 393 (E.D.Pa.1996).[7]

■ The problem we have with plaintiff's claim under section 31–51q, however, is that plaintiff has failed to produce any evidence that would show that his expression of these concerns was a substantial or

6. In *Cotto*, plaintiff's petition for certiorari was granted limited solely to the issue: Did the Appellate Court properly hold that the plaintiff's expression or his refusal to display a political symbol was not protected by the first amendment to the United States constitution or by article first of the constitution of Connecticut? 245 Conn. 915, 717 A.2d 233.

7. Contrary to defendant's assertion that plaintiff has not stated a claim under section 31–51q because all of his speech took place on the employer's private property, the Connecti-

cut Court of Appeals has held that section 31–51q applies to activities and speech that occur in the workplace, solely on the private property of the employer. *See Cotto*, 48 Conn.App. at 628, 711 A.2d 1180. The critical question in a section 31–51q claim is not where the activity or speech occurred but what the activity or speech consisted of. *Id.; see also Emerick v. Kuhn*, 52 Conn.App. 724, —— A.2d ——, 1999 WL 223498, *9; *Olson*, 1994 WL 60050, *1, 2.

motivating factor in the employer's decision to discharge him. In actions based upon section 31–51q, there must be a causal connection between the disciplinary action against an employee and the exercise of the constitutional right by that employee. *D'Angelo v. McGoldrick*, 239 Conn. 356, 363, 685 A.2d 319 (1996); *Williams v. Bayer Corp.*, 982 F.Supp. at 124. Plaintiff has not produced any evidence to show that his statements or memoranda on safety concerns and lack of training were a motivating factor in his termination. Indeed, plaintiff's own testimony that his termination was a "personal thing" between him and Mr. Gasparino belies this conclusion. Therefore, finding no evidence from which a reasonable jury could conclude that plaintiff's protected speech entered into the decision to terminate him or that it was a substantial or motivating factor in his termination, we grant summary judgment in favor of defendant on plaintiff's section 31–51q claim.

### III. Violation of the Whistleblower Statute. Conn.Gen.Stat. § 31–51m (Count Four)

Plaintiff's fourth count alleges that defendant violated Connecticut's Whistleblower statute, Conn.Gen.Stat. § 31–51m(b), which provides in relevant part:

No employer shall discharge, discipline or otherwise penalize any employee because the employee ... reports, verbally or in writing, a violation or a suspected violation of any state or federal law or regulation or municipal ordinance or regulation *to a public body* ....

(Emphasis added). Defendant asserts that plaintiff cannot meet the requirements of this statute because he did not report any violation or suspected violation to a "public body" as that term is defined by the statute. Section 31–51m(a)(4), Conn.Gen.Stat., defines "public body" as

(A) any public agency, as defined in subdivision (1) of section 1–200, or any employee, member or officer thereof, or (B) any federal agency or any employee, member or officer thereof.

Section 1–200(1), Conn.Gen.Stat., (formerly Conn.Gen.Stat. § 1–18a) defines "public agency" as:

any executive, administrative or legislative office of the state or any political subdivision of the state and any state or town agency, any department, institution, bureau, board, commission, authority or official of the state or of any city, town, borough, municipal corporation, school district, regional district or other district or other political subdivision of the state, including any committee of, or created by, any such office, subdivision, agency, department, institution, bureau, board, commission, authority or official, and also includes any judicial office, official, or body or committee thereof but only in respect to its or their administrative functions.

Plaintiff testified that he only reported the alleged regulatory violations internally to defendant.[8] Defendant states that it is a private corporation and does not fall within this definition of "public agency." It does not receive government funding and was not created by the government. Plaintiff has merely averred in his complaint that defendant is a "public agency" but offers nothing in support of this claim.

We find, as a matter of law, that defendant is not a "public agency." Plaintiff does not claim to have reported the alleged regulatory violations to any other entity. Therefore, plaintiff's claim under the Whistleblower Statute fail as a matter of law. *See Girgenti v. Cali–Con, Inc.*, 15 Conn.App. 130, 139, 544 A.2d 655 (1988).

### IV. Negligent Misrepresentation (Count Five)

In Count Five, plaintiff alleges that defendant represented to him that he

---

8. In his deposition, plaintiff testified that he reported the incidents to his supervisor, Mr. Gasparino, the market manager, to Mr. Shef-field, to Bill Russell, a vice president, and to Mr. Mauch, the president of the company. (Pl.'s depo. at 139–40).

would not be subject to adverse action affecting his employment and would not be discharged for performing his job duties, including reporting to management improper conduct of other employees, yet contrary to these representations, defendant terminated him after he reported his concerns about safety, customer service, employee attitudes, racial remarks, inventory control problems, training, and safety concerns about the Mystic Village installation. Plaintiff claims that had defendant not misrepresented its intentions only . to terminate employees for fair reasons, plaintiff would not have accepted the job with defendant in the first place.

Defendant argues that this Count should be dismissed because plaintiff was not terminated for performing his job duties. He was terminated for not performing them. *See Munson v. United Technologies Corp.,* 28 Conn.App. 184, 192, 609 A.2d 1066 (1992).

The principles governing an action for negligent misrepresentation are set forth in section 552 of the Restatement (Second) of Torts, which provides:

> One who, in the course of his business, profession or employment . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*See D'Ulisse–Cupo,* 202 Conn. at 217–18, 520 A.2d 217. Plaintiff's claim for negligent misrepresentation relies upon the same statements as his breach of contract claims, discussed above.

■ It is difficult to fathom how plaintiff justifiably relied on these statements that he would only be terminated for fair reasons when he signed a written acknowledgement that he was an at-will employee and received written policies stating that he could be terminated with or without

cause. Moreover, plaintiff has produced no evidence to show that the statements, when made, were untrue or should have been known to be untrue. In fact, to the contrary, plaintiff has produced the deposition testimony of Mr. Roberts, who had been with AmeriGas for 15 years, which indicates that it was generally defendant's practice to treat employees fairly in disciplining them or terminating them. We find that plaintiff has failed to state a claim for negligent misrepresentation and, therefore, defendant is entitled to summary judgment on Count Five.

## V. Negligent Infliction of Emotional Distress (Count Six)

Plaintiff's last claim is for negligent infliction of emotional distress. After reviewing the myriad of affidavits, deposition testimony, and the extensive briefs that have been submitted by the parties, we appreciate plaintiff's concern with the termination process. He was terminated on the spot, without an opportunity to rebut the charges against him, and without being given credit for the good things that he had accomplished during his brief tenure with AmeriGas. However, as unfair as the process may have been, we do not find that it was so outrageous as to give rise to a claim for negligent infliction of emotional distress.

■ The mere termination of employment, even where it is wrongful, is not enough to sustain a claim for negligent infliction of emotional distress. *Malik v. Carrier Corp.,* 986 F.Supp. 86, 92 (D.Conn. 1997). Accordingly, such a claim in the context of an employment termination arises only where it is based upon unreasonable conduct on the part of the employer in the termination process. *Parsons,* 243 Conn. at 88, 700 A.2d 655. "The mere act of firing an employee, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior." *Id.* at 89, 700 A.2d 655 (quoting *Madani v.*

*Kendall Ford, Inc.,* 312 Or. 198, 818 P.2d 930 (1991)).

 In the instant case, plaintiff neither makes factual allegations nor comes forward with factual evidence to show that AmeriGas engaged in unreasonable conduct during the termination process. He bases his claim upon the above-cited conduct of defendant's managers, and in particular Mr. Gasparino, who, plaintiff contends, never had any intention of discharging plaintiff for reasons that were fair or of allowing plaintiff to rebut the charges against him. He also asserts that individuals who ignored safety violations and actually caused harm to members of the public (an explosion at a restaurant and a residence) were promoted and certainly not terminated from employment with defendant.

In *Musielski v. Jewish Home for the Elderly,* No. CV 960330050, 1998 WL 236180, *5 (Conn.Super. May 4, 1998), the court held that where the plaintiff was terminated without cause, where plaintiff's duties were withdrawn little by little, and where plaintiff was not allowed to say good-bye to the residents and staff of the defendant, such facts did not present a genuine issue of material fact and, therefore, the court granted summary judgment in favor of defendant on plaintiff's negligent infliction of emotional distress claim.

This case is similar to *Musielski.* While defendant's dealings with its employees may not have been even-handed, plaintiff's claims do not, as a matter of law, give rise to a claim for negligent infliction of emotional distress. They do not transgress the bounds of socially tolerable behavior. *See Parsons,* 243 Conn. at 88–89, 700 A.2d 655. Therefore, summary judgment is granted in favor of defendant on Count Six.

## CONCLUSION

Accordingly, for the reasons set forth above, defendant's motion for summary judgment on all counts of plaintiff's complaint is GRANTED [**Doc. # 32**].

**SO ORDERED.**