**DRC PARTS & ACCESSORIES, L.L.C., Appellant,**

v.

**VM MOTORI, S.P.A., Appellee.**

**No. 14–01–00507–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

Aug. 7, 2003.

Dennis A. McQueen, Houston, for appellants.

Stephen M. Fernelius and Warren Szutse Huang, Houston, for appellees.

En Banc Panel consists of Chief Justice BRISTER, and Justices YATES, ANDERSON, J. HARVEY HUDSON, FOWLER, RICHARD H. EDELMAN, FROST, SEYMORE and GUZMAN.

## MAJORITY OPINION
## ON REHEARING
## EN BANC

RICHARD H. EDELMAN, Justice.

Appellant's motion for rehearing en banc is granted, the majority and dissenting opinions issued in this case on October 17, 2002, are withdrawn, and the following majority and dissenting opinions on rehearing en banc are issued in their place.

In this breach of contract and fraud case, DRC Parts & Accessories, L.L.C. ("DRC"), appeals a summary judgment entered in favor of VM Motori, S.P.A. ("VM") on the grounds that its summary judgment evidence raised a fact issue on each of its two claims against DRC. We affirm.

### Background

Before 1995, VM, an Italian manufacturer and seller of industrial diesel engines, parts, and accessories, contracted with DRC, among others, to distribute its products in North America. However, in 1995, VM was purchased by Detroit Diesel Corporation ("DDC"), an American manufacturer and distributor of diesel engines, parts, and accessories that had an existing network of sales representatives in North America. Despite the resulting decrease in its need for DRC to distribute its products, VM agreed to continue the relationship because of DRC's extensive knowledge of VM's products. On May 14, 1996, VM and DRC entered into a written con-

tract (the "contract") containing the following provision (the "provision"):

> VM ... grants on a non-exclusive basis ... DRC ... the right to purchase and sell VM diesel engine ORIGINAL SPARE PARTS for engine series and/or engine model versions not in-current production by VM and VM ORIGINAL ACCESSORIES for current and non-current series of engines, in the USA or Canada, hereinafter referred to as the TERRITORY ....

The contract further provided that it "substitute[d] and invalidate[d] any other former agreement."

Thereafter, DRC filed suit against VM for breach of contract, alleging that: (1) the contract gave it the exclusive right to sell parts for engines that were no longer being produced by VM, and that VM had breached the agreement by selling such parts to others; and (2) in the alternative, if the contract granted DRC only a non-exclusive right, then VM fraudulently induced DRC to enter into and continue performance under the contract by nevertheless misrepresenting that DRC's right would be exclusive. VM moved for summary judgment against these claims[1] on the grounds that: (1) the contract unambiguously gave DRC only a non-exclusive right to distribute non-current production engine parts; and (2) as a matter of law, DRC could not rely on the alleged misrepresentation because it directly contradicted the unambiguous terms of the contract. The trial court granted VM summary judgment against both of DRC's claims.

### Standards of Review

A traditional summary judgment may be granted if the motion and summary judgment evidence show that there is no genu-

---

**1.** Although VM moved for a traditional summary judgment on both claims and also for a no-evidence summary judgment on the con-

tract claim, the difference is not material to our disposition.

ine issue of material fact and the moving party is entitled to judgment as a matter of law on the issues expressly set out in the motion or response. Tex.R. Civ. P. 166a(c). In reviewing such a motion for summary judgment, we take all evidence favorable to the nonmovant as true and resolve every doubt, and indulge every reasonable inference, in the nonmovant's favor. *Tex. Commerce Bank, N.A. v. Grizzle*, 96 S.W.3d 240, 252 (Tex.2002).

A no-evidence motion for summary judgment must be granted if: (1) the moving party asserts that there is no evidence of one or more specified elements of a claim or defense on which the adverse party would have the burden of proof at trial; and (2) the respondent produces no summary judgment evidence raising a genuine issue of material fact on those elements. *See* Tex.R. Civ. P. 166a(i). In reviewing a no-evidence summary judgment, we review the record in the light most favorable to the nonmovant to determine whether more than a scintilla of evidence was presented on the challenged elements of the nonmovant's claim. *See Wal–Mart Stores, Inc. v. Rodriguez*, 92 S.W.3d 502, 506 (Tex.2002).

### Breach of Contract: Ambiguity

■ DRC's first issue challenges the summary judgment on its breach of contract claim on the ground that the contract is ambiguous, raising a question of fact. In particular, DRC contends that the term "non-exclusive," as used in the provision, can reasonably be interpreted to mean either that: (1) VM retained the right to sell parts for engines not in-current production through entities other than DRC; or (2) DRC had the exclusive right to sell such parts.

■ Whether a contract is ambiguous is a question of law for the court to decide. *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 861 (Tex.2000). A contract is not ambiguous if it is so worded that it can be given a definite or certain legal meaning. *Wal–Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 728 (Tex.2001). Conversely, a contract is ambiguous if its language is subject to two or more reasonable interpretations. *Monsanto Co. v. Boustany*, 73 S.W.3d 225, 229 (Tex.2002).

■ However, an ambiguity does not arise simply because the parties advance conflicting interpretations of the contract. *Wal–Mart Stores*, 52 S.W.3d at 728. Rather, for an ambiguity to exist, both interpretations must be reasonable. *Id.* If so, a fact issue is created concerning the parties' intent. *See Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex.1996).

■ In this case, the contract unequivocally grants DRC the right, on a "*non-exclusive* basis" to purchase and sell the engine parts in question. DRC has cited no language in the contract that remotely supports an exclusive right to sell those parts or is in any way inconsistent with a non-exclusive right. Although DRC relies on the circumstances surrounding the formation of the contract to establish that its interpretation is reasonable, such parol evidence is not admissible for the purpose of *creating* an ambiguity in an agreement. *Kelley–Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex.1998). Rather, it is only when the language of a contract is ambiguous, either on its face or when applied to the subject matter of the contract,[2] that a court may consider extrinsic evidence to determine

---

**2.** Such a "latent ambiguity" would exist, for example, if a contract called for delivery to the "green house on Pecan Street," but there were two green houses on that street. *Nat'l Union Fire*, 907 S.W.2d at 520 n. 4.

the meaning of the instrument. *See Nat'l Union Fire Ins. Co. v. CBI Indus. Inc.,* 907 S.W.2d 517, 521 (Tex.1995). Because the contact in this case is not ambiguous in either respect, DRC has not demonstrated a fact issue on its contract claim (that VM breached the contract by selling the engine parts in question to others). Accordingly, we overrule DRC's first issue.

## Fraudulent Inducement

■ DRC's second issue contends that, if the contract term "non-exclusive" is unambiguous (as we conclude above), then a fact issue was raised on its fraudulent inducement claim by evidence that VM falsely represented to DRC that it would have an exclusive right to distribute parts for non-current production engines.

■ One of the elements of a fraud claim is that the plaintiff actually *and justifiably* relied on the misrepresentation to suffer injury. *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.,* 51 S.W.3d 573, 577 (Tex.2001); RESTATEMENT (SECOND) OF TORTS § 537 (1977). In this regard, a party to an arm's length transaction must exercise ordinary care and reasonable diligence for the protection of his own interests, and a failure to do so is not excused by mere confidence in the honesty and integrity of the other party. *Thigpen v. Locke,* 363 S.W.2d 247, 251 (Tex.1962). Therefore, reliance upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law.[3]

This principle is also dictated by policy and practical considerations. If written contracts are to serve a purpose under the law, relative to oral agreements, it is to provide greater certainty regarding what the terms of the transaction are and that those terms will be binding, thereby lessening the potential for error, misfortune, and dispute.

By contrast, the approach advocated by DRC and the dissent would, in effect, create a contractual relationship that is governed by its written contract only to the extent it does not contradict a previous oral agreement between the parties. This is because a party's exercise of a right under the written contract, which is contrary to the oral agreement, would subject that party to a fraudulent inducement claim based on the oral agreement. In that event, however, the party who entered into the written contract while relying on a contrary oral agreement would thereby itself entered into the written contract with an intent not to perform it. Thus, in order to show its reliance on the oral agreement to sustain its own fraudulent inducement claim, that party would necessarily prove that it was guilty of fraudulent inducement as well.[4]

■ The essential issue, then, is not whether that party's evidence of the contrary oral agreement is admissible or sufficient to *prove* that agreement,[5] but instead

---

3. *Scheduled Airlines Traffic Offices, Inc. v. Objective Inc.,* 180 F.3d 583, 590 (4th Cir.1999); *Republic Nat'l Bank v. Hales,* 75 F.Supp.2d 300, 315 (S.D.N.Y.1999); *Lowe v. Amerigas, Inc.,* 52 F.Supp.2d 349, 361 (D.Conn.1999); *Schwaiger v. Mitchell Radiology Assocs.,* 652 N.W.2d 372, 377 (S.D.2002); *Abboud v. Michals,* 241 Neb. 747, 491 N.W.2d 34, 41–42 (1992).

4. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 47–48 (Tex.1998) (recognizing that a promise of future performance constitutes fraud in the inducement if the promise was made with no intention of performing).

5. *See Town N. Nat'l Bank v. Broaddus,* 569 S.W.2d 489, 492, 493–94 (Tex.1978) (holding that a payee's representation to the maker of a note, that the maker would not be liable

whether the law will deem such reliance to be justified and thereby favor that party to the detriment of the other contracting party, which has at least declared its intent in the contract and sought to abide by its terms. Because such an approach would defeat the ability of written contracts to provide certainty and avoid dispute, the prevailing rule, recited above, is instead that a party who enters into a written contract while relying on a contrary oral agreement does so at its peril and is not rewarded with a claim for fraudulent inducement when the other party seeks to invoke its rights under the contract.

In this case, therefore, even assuming DRC's evidence to be admissible and sufficient to show its actual reliance on a contrary oral agreement, that reliance could not, as a matter of law, have been justified. Accordingly, we overrule DRC's second point of error and affirm the judgment of the trial court.

Chief Justice BRISTER and Justices YATES, ANDERSON, FROST and SEYMORE join the Majority Opinion.

Justice J. HARVEY HUDSON filed a Dissent in which Justices FOWLER and GUZMAN join.

J. HARVEY HUDSON, Justice, dissenting on Rehearing En Banc.

Regarding the second issue raised by DRC Parts & Accessories, L.L.C., the majority holds that extrinsic evidence is, as a matter of law, insufficient to show fraud in the inducement of a written contract when such evidence is rebutted by the express terms of the agreement. The rationale for this holding is that a party can never "justifiably rely" on oral representations that are contrary to the express terms of the written agreement. I respectfully dissent, not because I disagree with the aforementioned principle as a *general* statement of the law, but because it cannot be *universally* applied to all fact scenarios. Here, DRC presented *substantial* summary judgment proof raising a fact issue regarding whether it justifiably relied on oral and written representations that conflict with the written contract. Considering both the terms of the contract and the circumstances under which it was formed, I do not believe DRC's summary judgment evidence is insufficient, as a matter of law.

### PROOF OF "JUSTIFIABLE RELIANCE"

To prove fraudulent inducement, a party must show: (1) a false material representation; (2) known to be false or made without knowledge of the truth; (3) which was intended to be acted upon; (4) was relied upon; and (5) caused injury. *Formosa Plastics,* 960 S.W.2d 41, 47–48 (Tex. 1998). The majority holds the evidence presented by DRC was insufficient to show it *justifiably relied* on any alleged misrepresentations. I disagree.

The summary judgment proof shows that prior to 1995, VM Motori, S.P.A., marketed its engines, parts, and accessories in North America *exclusively* through DRC. In 1995, however, VM was purchased by Detroit Diesel Corporation which had a vast existing sales network in North America. Nevertheless, VM Motori/Detroit Diesel retained the services of DRC and its president, Dale Chambliss, to (1) market *some* VM products in North America, and (2) help train and advise Detroit Diesel regarding sales of the VM product line.

According to Chambliss, VM made a number of different types of engines. Like most manufacturers, the product line

thereon, in the absence of trickery, did not constitute fraud in the inducement (so as to

fall within an exception to the parol evidence rule)).

changed from year to year—as new models were added, some of the older versions became "obsolete" and were phased out of production. New engine models, however, sometimes incorporated parts from previous engine models. Therefore, some replacement parts were common to both current and obsolete engines—such parts were known as "common parts," *i.e.,* parts that were compatible with several engine models.

To support its customer base, VM offered a supply of replacement parts for both its current and obsolete engines. Detroit Diesel, however, had limited knowledge of VM's obsolete product line and focused its attention primarily on distributing and improving current production models. Thus, according to Chambliss, after 1995, VM Motori/Detroit Diesel granted DRC the exclusive right to sell "non-common" replacement parts and accessories for obsolete engines. Because "common parts" were used in current production models (and thus sold and distributed by Detroit Diesel), they were not included within the ambit of DRC's exclusive sales agreement.

The written agreement between DRC and VM plainly states that DRC is granted the right to sell parts for engines "not in current production." However, it just as plainly states that such right is "non-exclusive." It is upon this clause that the majority relies in holding that DRC could not reasonably believe it had been granted an exclusive right to distribute replacement parts for "obsolete" engines in North America. Nevertheless, DRC submitted considerable summary judgment evidence of repeated oral and written representations from VM Motori/Detroit Diesel that it had such a right. Moreover, DRC further contends its reliance on these representations was reasonable, even in the face of contrary language in the written agreement, because *VM Motori represented that the term "non-exclusive" was included in the contract only to resolve the problem of distributing "common parts."* Without such language, Detroit Diesel might be considered in breach of the agreement when it sold replacement parts for current engine models that were also compatible with obsolete engines.

In other words, when VM Motori was acquired by Detroit Diesel in 1995, DRC lost its exclusive right to market *all* VM Motori engines and parts in North America. However, Chambliss claimed that DRC was granted the exclusive right to market parts (but not common parts) for obsolete engines that were no longer in production. Chambliss explained the new relationship with VM Motori/Detroit Diesel as follows:

> In order to continue its previous levels of sales of engines and parts in North America, VM encouraged DRC and I to participate in the implementation of a new program involving Detroit Diesel. VM initiated discussions regarding DRC's role in the sale of VM products, and how that role would tie in with Detroit Diesel's plans for the VM line. VM suggested that DRC and I provide beneficial services to VM and Detroit Diesel, including training and providing technical information regarding the VM product line to Detroit Diesel's distributors. In addition, because Detroit Diesel had no fixed system for the distribution of VM's entire product line, VM suggested an agreement whereby *DRC would sell parts for engines which were no longer being manufactured by VM ("non-current production engines"), and VM engine accessories; while Detroit Diesel would sell the newer model engines and parts for those engines. VM told me on several occasions that the agreement would provide that all sales*

*of parts for non-current production engine parts and accessories would be sold exclusively through DRC.*

(Emphasis added).

Even before the parties signed a new contract, VM Motori began making arrangements to channel all of its North American orders for non-production engine parts through DRC. On February 8, 1996, Tom Freiwald, the senior vice-president of Detroit Diesel and the former vice-president of VM Motori sent a memorandum to VM Motori's regional vice-presidents advising them of Dale Chambliss', *i.e.,* DRC's, new role in distributing parts:

> There are some obsolete VM engine models operating in N.A. that are no longer in production. Dale is familiar with these engines and *will become the source of supply of parts for these out of production engines.* Parts for all current engines will be supplied by Canton [*i.e.,* Detroit Diesel in Canton, Ohio]. Tony Bonacci and Dale will be providing additional information about how to order the parts for the out of production VM engines.

(Emphasis added).

Two months later, on April 2, 1996, the Spare Parts Department of VM Motori sent the following memo to Chambliss:

> SUBJECT: *YOUR NEW CONTRACT.* We are going to send you, in a very short time, the new contract, issued by VM–Motori, which you will have eventually to sign for approval. (Your contract proposal has been slightly modified). Meanwhile, as you know, you are already enjoing [sic] our new favourable [sic] discounts, even if we are still receiving orders from M & L and Graham Ford (supposed to go through your company). We wish to remind you that you've been granted such discount in order to let you better operate with other U.S. customers, therefore, you are

kindly requested to approach them from now and advise them about your new position in U.S.A. As soon as you receive and accept the agreement, now under preparation, then you can start to *convey all the U.S. orders directly to us.*

(Underlining in the original).

Thereafter, on May 9, 1996, just days before the new agreement was signed, VM Motori sent the following message from Italy to M & L (a North American customer):

> To: M & L—To Whom It May Concerned [sic]
>
> Kindly be advised that as from 1–5–1996 [May 1, 1996] all your spare parts requirements have to be chanelled [sic] through DDC–Canton–Ohio [*i.e.,* Detroit Diesel] for VM current engines' spare parts, *through DRC (Mr. Chambliss) for spares related to VM engines of non current production.*

(Italics added; underlining in the original).

To Chambliss' surprise, however, when VM Motori/Detroit Diesel sent the contract to DRC, it contained a provision granting to DRC "on a non-exclusive basis ... the right to purchase and sell VM diesel engine ORIGINAL SPARE PARTS for engine series and/or engine model versions not in-current production by VM ...." Because this language seemed to be contrary to their oral agreement, Chambliss contacted VM Motori/Detroit Diesel. Chambliss states in his affidavit:

> VM finally sent a ... distribution agreement to me to execute on behalf of DRC, but it stated that DRC would have a "non-exclusive" right to purchase parts. I questioned VM regarding the use of the term "non-exclusive", in response to which VM told me that it was necessary to describe this as a "non-exclusive distributorship" since many parts for non-current production engines were also

used in newer model engines, which VM would be selling to Detroit Diesel (the "common parts"). According to VM, the only way to provide for the common parts would be to grant DRC a "non-exclusive" right to purchase and sale [sic] parts; otherwise, VM could not sell the common parts to Detroit Diesel without being in breach of the agreement. As the use of that term under the circumstances was reasonable, and in reliance upon VM's representations regarding the meaning and effect of the terms of the agreement, I executed the agreement on behalf of DRC on May 14, 1996.

Throughout 1996, 1997, and most of 1998, DRC Parts sold parts for non-production model engines in North America believing it had the exclusive right to do so. This belief was justified not only by oral communications with VM Motori, but also many written communications. For example, when the Parts Manager of Industrial Engine Group of Graham Ford, Inc., (a company located in Columbus, Ohio) attempted to order parts directly from VM Motori, he was advised by VM Motori in June of 1996 that "Dale Chambliss of DRC Parts & Accessories had an exclusive contract for the sale of parts for non-current production VM Motori engines."

Thereafter, when DRC Parts complained to VM Motori regarding certain pricing policies of Detroit Diesel, it received the following reply on November 18, 1996:

SUBJECT: New DDC parts prices in U.S.A.

We wish to inform you that your remarks have been taken in due consideration and we thank you very much for your interesting report. Kindly note that we will contact DDC counterparts directly alerting them about the problem they are causing to you with their price policy. At the same time we will warn them to change their attitude and not to disclose any price or info. concerning spare parts for obsolete engines to their customers and/or distributors. *We will definitely remind DDC organization to channel to you all the inquiries or orders covering spares for no current production engines.*

(Emphasis added).

VM Motori appears to have tried to direct requests it received from its North American customers for non-production engine parts to DRC. For example, on January 23, 1998, the VM Motori Spare Parts Department sent the following memo to one of its customers:

SUBJECT: *Big impeller and bearing for SU 1053 Engine*

With ref. to your FAX of yesterday, addressed to Mr. Giorgio Govoni, I'm very pleased to advise you as follows:

1) VM part numbers required by your customer are 2.094.0018F (fan) and 4.637.0188A (roll bearing) both available at our warehouse.

2) For the above items and for all your spare parts need concerning VM's *obsolete engines*, you should contact for prompt info and delivery (and reasonable prices) our major customer in U.S.A. *who has signed a special contract with us only for these obsolete engines' spare parts: DRC,* Attention Mr. Dale Chambliss, PH. 713–4661250 FAX 713–4661320. DRC will have these items available

3) For VM current production engines' spares, obviously you should refer to DDC Canton as you know.

(Italics added; underlining in the original).

When it appeared that Detroit Diesel's other distributors might be selling non-production engine parts to North Ameri-

can customers, Chambliss complained. On March 20, 1998, he received the following reply, in pertinent part, from VM Motori's Spare Parts Department:

> ... *DDC has confirmed its engagement in instructing and addressing all the distributors to DRC for any need they might have for obsolete engines spare parts.*
>
> We trust DDC distributors will strictly adhere to the above commitment in the future as they did till now. We will keep monitoring the situation in order to avoid any breach of these rules by anyone.

(Emphasis added).

However, when it later appeared that non-production engine parts were being routinely sold by other Detroit Diesel distributors in North America, DRC brought this suit for breach of contract and fraud in the inducement.

I believe the aforementioned evidence raises a fact issue regarding DRC's reliance on alleged misrepresentations that precludes summary judgment.

### SUFFICIENCY OF THE EVIDENCE

Despite the aforementioned evidence, the majority holds, as a matter of law, it is *insufficient* to show fraud in the inducement because it conflicts with the express terms of a written agreement. Courts have struggled with the issue of whether fraud can be predicated upon misrepresentations that conflict with the express terms of a written contract. Indeed, the bench and bar are much in need of a bright-line rule to clarify the law in this regard, and the rule established by the majority is bright, well-reasoned, and easily applied by the bench and bar. Despite these laudable qualities, we are not writing on a clean slate, and I believe the majority goes too far.

The construction of a bright line rule is difficult because the parol evidence rule and fraud in the inducement are largely incompatible concepts. Thus, the tension between these ideas has generated inconsistent holdings.

### *Parol Evidence Rule*

The parol evidence rule is not a rule of evidence, but a rule of substantive law. *Hubacek v. Ennis State Bank,* 159 Tex. 166, 317 S.W.2d 30, 32 (1958). When a written contract is complete and unambiguous, the parol evidence rule bars admission of extrinsic evidence regarding prior or contemporaneous agreements. *Nat'l Union Fire Ins. Co. v. CBI Industries, Inc.,* 907 S.W.2d 517, 521 (Tex.1995); *Sun Oil Co. v. Madeley,* 626 S.W.2d 726, 731 (Tex.1981). While extrinsic evidence is admissible to clarify the terms of a contract that is ambiguous or incomplete, it is only admissible to the extent that it does not contradict the unambiguous terms of the contract. *See* TEX. BUS. & COM.CODE ANN. § 2.202 (Vernon 2002); *Lewis v. East Tex. Fin. Co.* 136 Tex. 149, 146 S.W.2d 977, 980 (1941); *McPherson v. Johnson,* 436 S.W.2d 930, 932 (Tex.Civ.App.-Amarillo 1968, writ ref'd n.r.e.); *see also Motorola, Inc. v. Chapman,* 761 F.Supp. 458, 463 (S.D.Tex. 1991) (applying Texas law).

Accordingly, negotiations preceding a written contract should not displace the terms of the written contract. *Fisher Controls Intern., Inc. v. Gibbons,* 911 S.W.2d 135, 141–42 (Tex.App.-Houston [1st Dist.] 1995, writ denied). When experienced executives represented by counsel voluntarily sign a contract whose terms they know, they should not be allowed to claim fraud in any earlier oral statement inconsistent with a specific contract provision. *Id.* at 142. Otherwise, contracts would be nothing more than a scrap of paper. *Id.*

### Fraudulent Inducement

On the other hand, the essence of a contract involves a meeting of the minds between the parties to the agreement. *Solis v. Evins,* 951 S.W.2d 44, 49 (Tex. App.-Corpus Christi 1997, no writ). Thus, for a contract to be formed, there must be a meeting of the minds as to the same thing in the same sense at the same time. *Angelou v. African Overseas Union,* 33 S.W.3d 269, 279 (Tex. App.-Houston [14th Dist.] 2000, no pet.). Where one party has been fraudulently induced to execute a written agreement, no contract exists because there is no meeting of the minds.

However, fraud can only be shown by the introduction of extrinsic evidence. Thus, the parol evidence rule will not prevent the use of oral testimony to establish fraud or mutual mistake. *American Imagination Corp. of Texas v. W.R. Pierce & Associates, Inc.,* 601 S.W.2d 147, 148 (Tex.Civ.App.-El Paso 1980, no writ). Accordingly, even where oral evidence tends to vary, contradict, or add to the terms of a contract, courts have recognized that such evidence is admissible to show inducements for executing the written agreement. *Anderson v. McRae,* 495 S.W.2d 351, 360–61 (Tex.Civ.App.-Texarkana 1973, no writ).

### Resolving the Conflict Between the Parol Evidence Rule and Fraudulent Inducement

When the parol evidence rule and the theory of fraudulent inducement collide, the majority defers to the parol evidence rule. Thus, where evidence of fraudulent inducement is contradicted by the express terms of a written agreement, the majority holds the evidence is insufficient, as a matter of law, to satisfy the element of justifiable reliance. Frankly, if we were writing on a clean slate, I might well agree with the majority's position. Certainly, I recognize that if a defendant can rely on extrinsic evidence (that conflicts with the express terms of a written agreement) under the premise that he was fraudulently induced to execute the document, then the parol evidence rule is eviscerated and a written contract is no better that an oral one.

However, as an intermediate appellate court, our holdings must not conflict or be inconsistent with the holdings of the Texas Supreme Court, and that court has held that fraud in the inducement may be established by extrinsic evidence. *See Santos v. Mid–Continent Refrigerator Co.,* 471 S.W.2d 568, 569 (Tex.1971) (holding parol evidence rule will not prevent proof of fraud or mutual mistake).[1]

---

**1.** The Supreme Court has acknowledged that a "review of the Texas cases on the question reveals conflicting decisions and indicates a resulting confusion which can hardly be resolved or explained away with nice distinctions." *Dallas Farm Mach. Co. v. Reaves,* 158 Tex. 1, 307 S.W.2d 233, 234 (1957). For example, *compare Prudential Ins. Co. of Am. v. Jefferson Assoc., Ltd.,* 896 S.W.2d 156, 162 (Tex.1995) (holding a buyer is not bound by a written agreement to purchase a building "as is" that he was induced to make because of a fraudulent representation); *Dallas Farm Mach. Co.,* 307 S.W.2d at 239 (embracing the majority position that parol evidence is admissible to establish fraud in the inducement even in the face of a "merger" clause in a

written contract); *Edward Thompson Co. v. Sawyers,* 111 Tex. 374, 234 S.W. 873, 874–75 (Tex.1921) (one who is entitled to avoid a written contract because it was induced by fraud is no longer bound by any of its stipulations, including those relating to representations or guaranties which induced its execution); *Rapid Transit Ry. Co. v. Smith,* 98 Tex. 553, 86 S.W. 322, 323 (1905) (holding that a contract induced by a promise made in bad faith is voidable); *and contrast with Distributors Inv. Co., et al. v. H.L. Patton,* 130 Tex. 449, 110 S.W.2d 47, 48 (1937) (holding that oral representations that conflict with the terms of a written contract are not admissible to show fraud because otherwise a written

This is not to say, however, that the mere hint of fraud is sufficient to overcome the plain language of a written contract. As with any factual issue, when the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of the fact's existence, the evidence is no more than a scintilla and, in legal effect, is no evidence at all. *Heldenfels Bros., Inc. v. City of Corpus Christi,* 832 S.W.2d 39, 41 (Tex.1992). Whether the evidence is sufficient to establish a particular fact (like justifiable reliance), must be determined on a case-by-case basis. *See Schlumberger Tech. Corp. v. Swanson,* 959 S.W.2d 171, 181 (Tex.1997) (holding that a disclaimer of reliance or merger clause will not *always* bar a fraudulent inducement claim).

I readily concede that the terms of a contract may be utilized as persuasive evidence in rebutting an allegation of fraud in the inducement, and when the express terms of a written agreement conflict with extrinsic evidence of fraud, the proponent may face an exceedingly difficult burden in establishing his claim or defense. In fact, in some situations, the terms of the contract and the circumstances under which it arose may render the proponent's evidence of fraudulent inducement insufficient, as a matter of law. *Id.* at 178–81. However, the factors which the Supreme Court considered in *Schlumberger* when assessing the sufficiency of the evidence to show justifiable reliance included: (1) the terms of the contract, (2) the circumstances surrounding its formation, (3) whether the parties were represented by counsel, and (4) whether the parties negotiated the contract at arm's length. *Id.* at 179–180.[2]

Here, the terms of the contract expressly state that the right granted to DRC was "non-exclusive." However, in light of oral and written representations by VM Motori/Detroit Diesel, both before and after the formation of the contract, DRC could have justifiably believed VM Motori/Detroit Diesel's alleged explanation that the term "non-exclusive" referred to the type of replacement parts and was inserted only to prevent Detroit Diesel from being in breach of the contract when it sold common parts to North American customers.[3]

---

contract would be of no higher dignity than an oral one); *Billington, et al. v. Vest,* 268 S.W.2d 705, 707 (Tex.Civ.App.-El Paso 1954, no writ) (holding that attaching the label of fraud to the oral representations does not change their character as inadmissible parol evidence).

**2.** A slightly different analysis has been used in assessing the sufficiency of evidence of fraudulent inducement where the contract is a promissory note. *See Town N. Nat'l Bank v. Broaddus,* 569 S.W.2d 489, 491 (Tex.1978) (holding that to prevail in asserting fraud as an affirmative defense to a promissory note, the defendant must show some "trickery, artifice, or device"). *See also Simmons v. Compania Financiera Libano,* 830 S.W.2d 789, 791 (Tex.App.-Houston [1st Dist.] 1992, writ denied); *Litton v. Hanley,* 823 S.W.2d 428, 430 (Tex.App.-Houston [1st Dist.] 1992, n.w.h.); *Tripp Village Joint Venture v. MBank, Lincoln Centre, N.A.,* 774 S.W.2d 746, 749 (Tex.App.-Dallas 1989, writ denied); *Simpson v. MBank Dallas, N.A.,* 724 S.W.2d 102, 108 (Tex.App.-Dallas 1987, writ ref'd n.r.e.); *Friday v. Grant Plaza Huntsville Assoc.,* 713 S.W.2d 755, 756–57 (Tex.App.-Houston [1st Dist.] 1986, no writ); *Tex. Exp. Dev. Corp. v. Schleder,* 519 S.W.2d 134, 139 (Tex.Civ.App.-Dallas 1970, no writ).

The policy behind this heightened proof requirement is to avoid uncertainty and confusion in the law of promissory notes. *Id.* at 492; *see also Wagner v. Morris,* 658 S.W.2d 230, 232 (Tex.App.-Houston [1st Dist.] 1983, n.w.h.) (recognizing *Broaddus* as a narrow holding restricted to cases with similarly narrow facts); *JBV, Inc. v. Barkley,* 1997 WL 420785 at *6 (Tex.App.-Austin 1997, pet. denied) (recognizing the policy behind *Broaddus* is confined to promissory notes).

**3.** As to the other *Schlumberger* factors, it is unclear from the summary judgment record whether DRC was represented by counsel

Accordingly, DRC's summary judgment proof of "justifiable reliance" was not insufficient as a matter of law.[4] Thus, a fact issue exists as to whether DRC was fraudulently induced to execute the contract at issue. The existence of this fact issue precludes summary judgment. For this reason, I respectfully dissent.

during the formation of the written contract. It otherwise appears, however, that the parties negotiated the agreement at arm's length.

4. *See also Burleson State Bank v. Plunkett,* 27 S.W.3d 605, 615–16 (Tex.App.-Waco 2000, pet. denied) (holding jury could find party was fraudulently induced to enter contract by extrinsic agreements and misrepresentations despite the inclusion of a merger clause disclaiming any such agreements or representations); *Fletcher v. Edwards,* 26 S.W.3d 66, 76–77 (Tex.App.-Waco 2000, pet. denied) (holding that under the circumstances surrounding the formation of the contract, extrinsic evidence of fraudulent inducement was sufficient to create a fact issue precluding summary judgment even though the contract expressly stated the property was being sold "as is").