

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-21-00238-CV

**CC&T ENTERPRISES, LLC**,
Appellant

v.

**THE TEXAS 1031 EXCHANGE COMPANY**,
Appellee

From the 451st Judicial District Court, Kendall County, Texas
Trial Court No. 18-484
Honorable Kirsten Cohoon, Judge Presiding

Opinion by:   Irene Rios, Justice

Sitting:   Patricia O. Alvarez, Justice
Irene Rios, Justice
Beth Watkins, Justice

Delivered and Filed: February 28, 2023

AFFIRMED

This appeal involves a real estate exchange known as a "1031 exchange."[1] Appellant

CC&T Enterprises, LLC ("CC&T") sued appellee The Texas 1031 Exchange Company ("Texas

---

[1] "1031 exchange" refers to Internal Revenue Code section 1031, which states: "No gain or loss shall be recognized on the exchange of the real property held for productive use in a trade or business or for investment if such real property is exchanged solely for real property of like kind which is to be held either for productive use in a trade or business or for investment." I.R.C. § 1031(a)(1); *see also Tukua Invs., LLC v. Spenst*, 413 S.W.3d 786, 792 n.2 (Tex. App.—El Paso 2013, pet. denied) ("Under Section 1031 of the U.S. Internal Revenue Code, a seller of real property may avoid capital gains tax by exchanging the sold property for a property of 'like-kind' within 180 days of the sale.").

1031") for violating the Texas Deceptive Trade Practices Act ("DTPA"), negligence, negligent misrepresentation, breach of fiduciary duty, and breach of contract, claiming Texas 1031 caused CC&T to pay excess capital gains tax associated with the real estate exchange. The trial court disposed of CC&T's DTPA, negligence, negligent misrepresentation, and breach of fiduciary duty claims by granting Texas 1031's motion for partial summary judgment. During the pretrial conference, on Texas 1031's Rule 166(g) motion, the trial court ruled Texas 1031 did not breach any agreement with CC&T as a matter of law. *See* TEX. R. CIV. P. 166(g). Because the ruling eliminated CC&T's remaining breach of contract claim, the trial court rendered a take-nothing judgment in favor of Texas 1031.

CC&T appeals the trial court's final judgment disposing of its claims against Texas 1031.[2] We affirm.

## BACKGROUND

CC&T contacted Texas 1031 to assist in completing a like-kind exchange of real property, exchanging one ranch property for another ranch property, pursuant to section 1031 of the Internal Revenue Code. *See* I.R.C. § 1031(a)(1). Under the Internal Revenue Code, if a property owner satisfies the statutory components, section 1031 allows the property owner to defer capital gains tax when it exchanges or replaces its sold property (the "relinquished property") with property of like-kind (the "replacement property"). *See id*. If the property owner does not satisfy section 1031's requirements, any capital gain resulting from the sale of the relinquished property not reinvested in the replacement property pursuant to section 1031 (known as the "boot") must be immediately realized by the property owner. *See* I.R.C. § 1031. However, in the event the capital

---

[2] The trial court's final judgment incorporated the partial summary judgment and Rule 166(g) ruling. CC&T did not present issues on appeal addressing the trial court's final judgment with respect to CC&T's claims for negligence, negligent misrepresentation, and breach of fiduciary duty. We do not consider or address those dismissed claims and focus only on CC&T's DTPA and breach of contract claims in this appeal.

gain from the sale of the relinquished property is not completely absorbed within the purchase price of the replacement property, the excess capital gain can also be deferred by completing various improvements to the replacement property, such as maintenance, repairs, and construction within 180 days, and in accordance with the restrictions set forth in the Internal Revenue Code. *See id.* A 1031 exchange requires the property owner use a qualified intermediary to facilitate the buying and selling of the properties. *See* 26 C.F.R. § 1.1031(k)–1(g)(4)(iii) (defining "qualified intermediary"[3]).

### A. The Parties' Agreement as Reflected in Written Documents

CC&T engaged Texas 1031 to serve as the qualified intermediary to facilitate its 1031 exchange. Three documents represent the parties' agreement: (1) the Engagement for Section 1031 Tax-Deferred Exchange ("Engagement Agreement"); (2) the Section 1031 Exchange Agreement (the "Exchange Agreement"); and (3) the Requirements for Section 1031 Exchange (the "Exchange Instructions"). Collectively these documents outlined the roles and responsibilities of the parties with respect to CC&T's 1031 exchange.

### 1. Engagement Agreement

Initially, the Engagement Agreement informed CC&T that Texas 1031 would provide the Exchange Instructions, and—after carefully reviewing the requirements—CC&T should contact Texas 1031 to discuss any concerns. The Engagement Agreement further stated Texas 1031 would

---

[3] A qualified intermediary is a person who—

   (A) Is not the taxpayer or a disqualified person[,] and

   (B) Enters into a written agreement with the taxpayer (the "exchange agreement") and, as required by the exchange agreement, acquires the relinquished property from the taxpayer, transfers the relinquished property, acquires the replacement property, and transfers the replacement property to the taxpayer.

26 C.F.R. § 1.1031(k)–1(g)(4)(iii).

prepare the Exchange Agreement, and the fee for serving as a qualified intermediary is $750, which included all necessary services "for one relinquished property and one replacement property."

The Engagement Agreement then explained that if a portion of the exchange proceeds would be used to construct improvements to the replacement property, a qualified exchange accommodation title holder ("EAT") must be involved. Under those circumstances, CC&T must assign the "Improvement Contract" to an EAT to accomplish the improvements. The Engagement Agreement further explains the EAT would convey title to the replacement property to CC&T following completion of the improvements. Any unused exchanged proceeds not reinvested in the replacement property under the Improvement Contract would be considered boot and subject to capital gains tax. CC&T is informed multiple times throughout the Engagement Agreement that Texas 1031 does not serve as CC&T's attorney or accountant and advised CC&T to separately seek advice from those professionals.

### 2. Exchange Agreement

The Exchange Agreement detailed the process for CC&T and Texas 1031 to complete CC&T's 1031 exchange. Nonetheless, section 2.17 entitled "Improvements to Replacement Property" explained CC&T could enter into an additional agreement, an "Improvement Contract," with an EAT to make improvements. The section called for CC&T to provide a detailed description of the improvements to the replacement property within 45 days of the sale of the relinquished property, the same timeframe CC&T had to specifically identify the replacement property. Moreover, under the compensation section of the Exchange Agreement, subsection 3.1(a), stated the "Basic Exchange Fee" was $750 for "all necessary services for one relinquished property and one replacement property"—the same service and for the same fee set forth in the Engagement Agreement. On the other hand, if CC&T desired an EAT to improve the replacement property,

CC&T would need to pay "the additional fee [of] $3,450.00 for the cost of the construction improvements" and establish a limited liability company to hold title to the replacement property.

The Exchange Agreement also contained the following provision related to prior agreements:

> To the extent that the Parties have entered into any prior oral or written agreements concerning the acquisition and/or disposition of the properties which are the subject of this Agreement, . . . then the terms of the prior agreements . . . shall remain in full force and effect. However, to the extent that the terms of this Agreement conflict with terms of any prior agreements[,] then the terms of this Agreement shall supersede the terms of the prior agreements[.]

Similar to the Engagement Agreement, but in all capital letters, the Exchange Agreement stated CC&T had been advised to seek advice from its independent accountants, attorneys, and tax advisors prior to signing the agreement, and that CC&T had relied only upon the advice and judgment of those professionals.

### 3. Exchange Instructions

The Exchange Instructions reiterated some of the information explained in the Exchange Agreement. Specifically, the Exchange Instructions reminded CC&T that if improvements were going to be made to the replacement property, the improvements needed to be identified within 45 days and completed within 180 days of the sale of the relinquished property, and that an EAT needed to be involved with respect to completing the improvements. The instructions further stated there would be "additional fees when improvements [are] made as part of the exchange." Like the other documents, the Exchange Instructions caution CC&T to seek independent legal and accounting advice regarding the exchange because Texas 1031 did not serve in that capacity.

Also, pertinent to the parties' transaction, the Relinquished Property Closing Instructions and the Replacement Property Closing Instructions notably omit any mention of an Improvement Contract or an EAT. Contained within the Relinquished Property Closing Instructions is an

instruction to the escrow company to reflect Texas 1031's qualified intermediary fee in the amount of $750.00. As instructed, the escrow company's Final Seller's Statement regarding the sale of the relinquished property indicated the "1031 Exchange Fee to The Texas 1031 Exchange Company" was $750.00.

### B. The Lawsuit and Procedural History of the Case

Following the sale of the relinquished property and the purchase of the replacement property, CC&T discovered that the excess capital gains from the sale of the relinquished property not used to purchase the replacement property, the boot, could no longer be tax deferred by making improvements to the replacement property because the appropriate requirements for an improvement exchange were not met and the basic exchange did not defer the remaining boot. CC&T subsequently sued Texas 1031.

In its original petition, CC&T alleged several causes of action against Texas 1031, including DTPA, negligence, negligent misrepresentation, breach of fiduciary duty, and breach of contract. CC&T specifically claimed it had paid Texas 1031 $750 for the transaction to accomplish the 1031 exchange and defer all capital gains but discovered several weeks after closing that the 1031 exchange "was not properly 'set up' (established)[,]" which subjected CC&T to capital gains tax and additional damages.

Texas 1031 filed a motion for partial summary judgment seeking to dismiss CC&T's DTPA, negligence, negligent misrepresentation, and breach of fiduciary duty claims. Generally, Texas 1031 asserted CC&T's tort claims were precluded because the basis of CC&T's claims and alleged damages derived from the Exchange Agreement. With respect to CC&T's DTPA claim, Texas 1031 argued CC&T's complaints were premised on the contract, and thus not actionable under the DTPA. Without specifying any reasons, the trial court granted Texas 1031's motion for

partial summary judgment dismissing CC&T's claims for DTPA, breach of fiduciary duty, negligence, and negligent misrepresentation. At that time, only CC&T's breach of contract claim remained.

Prior to the trial setting, Texas 1031 filed a Rule 166(g) motion regarding "legal matters to be ruled on or decided by the [trial] court" to be heard at the pre-trial conference. TEX. R. CIV. P. 166(g). Texas 1031 requested the trial court resolve multiple issues, including that it did not breach any agreement with CC&T. The trial court granted Texas 1031's Rule 166(g) motion, ordering:

1. The contract is unambiguous and CC&T is barred from arguing that any of the agreements at issue are ambiguous because it did not plead ambiguity;

2. CC&T may not introduce parol evidence in an attempt to alter or change the terms of the written agreements;

3. CC&T is barred from arguing mutual mistake because it did not plead mutual mistake;

4. The Exchange Agreement's merger clause bars consideration of any prior agreements, written or oral, to the extent they conflict with the Terms of the Exchange Agreement; and

5. Texas 1031 did not breach any agreement with Plaintiff CC&T Enterprises, LLC.

The trial court subsequently rendered its final judgment and incorporated its (1) granting of Texas 1031's motion for partial summary judgment wherein it dismissed CC&T's claims for DTPA, breach of fiduciary duty, negligence, and negligent misrepresentation, and (2) finding, "as a matter of law pursuant to Texas Rule of Civil Procedure 166(g), that Texas 1031 did not breach any agreement with CC&T, thereby eliminating CC&T's only remaining cause of action." The trial court therefore ordered CC&T "*take nothing* on all of its claims against" Texas 1031. CC&T appeals.

## DISCUSSION

On appeal, CC&T raises seven issues. In its first issue, CC&T contends a fact issue remains on its DTPA and breach of contract claims and thus, the trial court erred in its judgment. CC&T's remaining six issues concern whether the trial court erred in its rulings concerning CC&T's breach of contract claim resulting in its take nothing final judgment. We will first address the DTPA claim, then the breach of contract claim.

## DTPA CLAIM

In its first issue, CC&T contends the trial court erred when it granted Texas 1031's summary judgment motion dismissing CC&T's DTPA claim because a material issue of fact precluded summary judgment on the DTPA claim. Texas 1031 counters CC&T's claims were based on the Exchange Agreement, and thus not actionable under the DTPA.

### A. Standard of Review

We review a trial court's ruling on a summary judgment motion de novo. *Tarr v. Timberwood Park Owners Ass'n, Inc.*, 556 S.W.3d 274, 278 (Tex. 2018). To prevail on a traditional summary judgment motion, the movant must show no genuine issue of material fact exists, and it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215–16 (Tex. 2003). In reviewing a trial court's summary judgment ruling, we take as true all evidence favorable to the nonmovant, indulging every reasonable inference and resolving any doubts in the nonmovant's favor. *Knott*, 128 S.W.3d at 215. "A trial court properly grants a defendant's traditional motion for summary judgment if the defendant disproves at least one element of each of the plaintiff's claims or establishes all elements of an affirmative defense to each claim." *Dall. Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 625 (Tex. 2018) (citation omitted). When as here, "the trial court does not specify the grounds for its

ruling, a summary judgment must be affirmed if any of the grounds on which judgment is sought [is] meritorious." *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013).

B.  *Applicable Law: Recasting a Contract Claim as a DTPA Claim*

Although limited to one recovery, a party may sue and seek damages on alternative theories of liability for the same injury. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 303 (Tex. 2006); *Waite Hill Servs., Inc. v. World Class Metal Works, Inc.*, 959 S.W.2d 182, 184 (Tex. 1998). However, "a mere breach of contract, without more, does not constitute a false, misleading or deceptive act in violation of the DTPA." *Crawford v. Ace Sign, Inc.*, 917 S.W.2d 12, 14 (Tex. 1996) (citation and internal quotation marks omitted); *see also Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991) ("[I]f the defendant's conduct . . . would give rise to liability only because it breaches the parties' agreement, the plaintiff's claim ordinarily sounds only in contract.").

Nevertheless, misrepresentations made apart from the contract may violate the DTPA. *See Int'l Med. Ctr. Enters., Inc. v. ScoNet, Inc.*, No. 01-16-00357-CV, 2017 WL 4820347, *8 (Tex. App.—Houston [1st Dist.] Oct. 26, 2017, no pet.) (mem. op.) (citing *Chapa*, 212 S.W.3d at 304–05). "Whether a breach of contract rises to the level of a misrepresentation sufficient to trigger the DTPA is a fact-driven inquiry." *Id.* (citing *Cont'l Dredging, Inc. v. De–Kaizered, Inc.*, 120 S.W.3d 380, 389 (Tex. App.—Texarkana 2003, pet. denied)). Determining if the facts constitute a DTPA violation is a question of law. *Id.* "Where an action 'depends entirely on pleading and proving the contract in order to establish a duty, the action remains one for breach of contract only, regardless of how it is framed by the pleadings.'" *Id.* (quoting *OXY USA, Inc. v. Cook*, 127 S.W.3d 16, 20 (Tex. App.—Tyler 2003, pet. denied)).

In *KLZ Diamond Tools, Inc. v. TKG General Agency, Inc.*, a business sued its insurance company under various causes of action, including breach of contract and DTPA, after suffering a significant loss from the theft of its business inventory and from the insurance company's alleged failure to pay the entire claim. No. 05-14-00458-CV, 2016 WL 3947412, at *1–2 (Tex. App.—Dallas July 18, 2016, no pet.) (mem. op.). The business pled that the insurance company committed several of the DTPA "laundry list" violations. *See id.* at *9. However, when attempting to explain "the 'misrepresentations' underlying these allegedly deceptive actions, [the business] referr[ed] to the same conduct it charge[d] as breach of the insurance contract"—a refusal to apply a replacement-cost measure of loss and refusal to pay the entire loss. *Id.* The Dallas Court of Appeals concluded that the business's DTPA claims of misrepresentation were rooted in its contractual relationship with the insurance company and thereby governed by contract law, not the DTPA. *Id.* The Court affirmed the insurance company's no-evidence summary judgment on the business's DTPA claims. *Id.*; *see also ScoNet*, 2017 WL 4820347, at *8–9 (affirming directed verdict on appellant's DTPA claims because its misrepresentation allegations arose out of and were dependent upon pleading and proving the contract and the interpretation of the contract's requirements).

In contrast, in *Chapa*, the Texas Supreme Court concluded a seller's misrepresentation that a buyer would receive a premium model of a vehicle when in fact she was going to receive a base model violated the DTPA. *Chapa*, 212 S.W.3d at 305 & n.15 (Tex. 2006) (citing TEX. BUS. & COM. CODE ANN. § 17.46(b)(7), (24)). The Court held that the seller's misrepresentation not only violated the DTPA but also the purchase agreement for the premium model vehicle. *See id.* Similarly, the Dallas Court of Appeals upheld a DTPA claim when a seller misrepresented owning and selling five bottles of 1945 Chateau Mouton Rothschild, only for the buyer to discover, after

paying $6,000 per bottle, that four of the bottles of wine were not authentic. *See Mewhinney v. London Wineman, Inc.*, 339 S.W.3d 177, 179–80 (Tex. App.—Dallas 2011, pet. denied). The Dallas Court of Appeals noted the buyer's allegations did not arise from receiving different wine than it selected to purchase; but rather, the bottles of wine it contracted to purchase were not what the seller represented them to be. *See id.* at 183. But for the initial misrepresentation, the buyer would not have entered the contract to buy the four bottles of wine it thought were 1945 Chateau Mouton Rothschild: this "representation was separate from the contract and [was] actionable under the DTPA." *Id.* (citing *Chapa*, 212 S.W.3d at 305).

*C. Analysis*

Here, CC&T's DTPA allegations pertain to complaints Texas 1031 did not deliver what CC&T expected to receive, an improvement exchange. Whether that was true depended on CC&T pleading and proving the terms of the contract and interpreting those terms and responsibilities of the parties as associated with the contract terms. CC&T did not allege misrepresentations independent of the contract. Both the basic exchange and an improvement exchange and their associated costs and responsibilities were set forth in the Exchange Agreement.

Unlike the situations from *Chapa* and *Mewhinney,* wherein the person is promised a certain good, pays for that certain good, but gets something else in its place, here, CC&T paid $750 for the basic exchange and received a basic exchange. CC&T did not pay the clearly identified $3,450 necessary to obtain an improvement exchange. Moreover, CC&T's misrepresentation allegations pertaining to the service it believed it was going to receive compared to what it actually received did not run afoul of the Exchange Agreement itself. CC&T's allegations of Texas 1031's misconduct were rooted in its contractual relationship with Texas 1031, and thereby governed by contract law, not the DTPA. *See Crawford*, 917 S.W.2d at 14.

To the extent CC&T argues in its first appellate issue that the trial court erred in granting Texas 1031's summary judgment motion dismissing CC&T's DTPA claim, we overrule CC&T's first issue.

## BREACH OF CONTRACT CLAIM

CC&T argues in its remaining issues that the trial court essentially erred in granting a take nothing judgment on CC&T's breach of contract claim. Specifically, CC&T contends the trial court erred when it granted Texas 1031's pretrial Rule 166(g) motion, which in effect granted Texas 1031 a no-evidence summary judgment on CC&T's breach of contract claim. *See* TEX. R. CIV. P. 166(g); *see also* TEX. R. CIV. P 166a(i). CC&T also challenges the trial court's rulings that: (1) CC&T was barred from arguing the parties' contract was ambiguous; (2) a mutual mistake existed concerning the contract; (3) a merger clause barred consideration of any other oral or written agreements between the parties to the extent they conflicted with the Exchange Agreement; and (4) CC&T could not introduce parol evidence to alter or change the terms of the written agreements.

We will first address Texas 1031's use of a Rule 166(g) motion eliminating CC&T's breach of contract claim, its only remaining claim following the trial court's earlier grant of Texas 1031's motion for partial summary judgment. Then, we will address CC&T's remaining issues pertaining to the trial court's rulings supporting its determination that Texas 1031 did not breach any agreement with CC&T.

*A. Rule 166(g) Motion*

In its seventh issue, CC&T contends the trial court's grant of Texas 1031's Rule 166(g) motion in essence amounted to granting a no-evidence motion for summary judgment on behalf of Texas 1031.

Under Rule 166, a trial court can convene a pretrial conference "to assist in the disposition of the case without undue expense or burden to the parties." TEX. R. CIV. P. 166. Subsection (g) of the rule provides that at the conference, the trial court may consider "[t]he identification of legal matters to be ruled on or decided by the court[.]" TEX. R. CIV. P. 166(g). According to the Texas Supreme Court, "Rule 166(g) authorizes trial courts to decide matters that, though ordinarily fact questions, have become questions of law because reasonable minds cannot differ on the outcome." *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018) (internal quotation marks omitted). If a trial court's order granting a Rule 166(g) motion disposes of the plaintiff's claims, "the order is akin to a summary judgment or directed verdict, and review is de novo." *Id.* (citations omitted); *see also City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005) (holding the legal sufficiency test applies the same to summary judgments, directed verdicts, and appellate no-evidence reviews).

Legal sufficiency review requires us to consider the evidence "in the light most favorable to the nonmovant, crediting evidence a reasonable jury could credit and disregarding contrary evidence and inferences unless a reasonable jury could not." *Merriman*, 407 S.W.3d at 248. "Judgment without or against a jury verdict is proper at any course of the proceedings only when the law does not allow reasonable jurors to decide otherwise." *City of Keller*, 168 S.W.3d at 823.

"Therefore, the question before us is not whether the procedure was authorized, but whether the circumstances were appropriate for such a ruling." *Hous. Metro Ortho & Spine Surgery, LLC v. Juansrich, Ltd.*, No. 14-19-00732-CV, 2021 WL 2799643, *6 (Tex. App.— Houston [14th Dist.] July 6, 2021, pet. denied) (mem. op.). Here, the agreements defining the contractual relationship between the parties was before the trial court. If the trial court correctly found there is no ambiguity in the contract, the merger clause precluded any purported

representation or oral agreement that conflicted with the written contract, and parol evidence is disallowed, then the trial court had authority under Rule 166(g) to make a ruling that 1031 Exchange did not breach the written contractual agreements as a matter of law. *See Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 480 (Tex. 2019) ("[A] trial court errs[, regardless if harmless if the jury finds as the trial court should have found], when it submits an unambiguous contract to the jury rather than construing it as a matter of law.") (citing *Gohman v. Kahlig*, 318 S.W.3d 882, 887 (Tex. 2010)). As more thoroughly explained below, under the specific circumstances of this case, the trial court had authority to determine the issues raised in Texas 1031's Rule 166(g) motion as a matter of law because reasonable minds could not differ on the outcome of CC&T's breach of contract claim. We overrule CC&T's seventh issue as to its procedural attack against the trial court's granting Texas 1031's Rule 166(g) motion resulting in CC&T's take nothing judgment.[4]

### B. Contract Construction

In construing a contract, our primary concern is to ascertain the parties' intentions, as expressed in the contract itself. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co of Am.*, 341 S.W.3d 323, 333 (Tex. 2011). To ascertain the parties' intentions, we examine the entire agreement to harmonize and give effect to all its provisions so that none will be rendered meaningless. *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 652 (Tex. 1999). We "presume parties intend what the words of their contract say and interpret contract language according to its plain,

---

[4] CC&T additionally asserted Texas 1031's Rule 166(g) motion did not provide it with the proper twenty-one-day notice as is required for a summary judgment motion. Texas 1031 did not file another motion for summary judgment; rather, it filed a motion under Rule 166, which does not require the non-movant have twenty-one-days' notice. *Compare* TEX. R. CIV. P. 166(a), *with* TEX. R. CIV. P. 166. Moreover, Texas 1031's Rule 166(g) motion was filed March 15, 2021, three days before the pretrial conference. *See* TEX. R. CIV. P. 21. CC&T responded to the motion on March 17, 2021, and the trial court issued its order granting Texas 1031's Rule 166(g) motion March 22, 2021. The final judgment was rendered March 24, 2021.

ordinary, and generally accepted meaning unless the instrument directs otherwise." *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 764 (Tex. 2018) (citations omitted).

The parol evidence rule does not prohibit courts from considering extrinsic evidence of the facts and circumstances surrounding the contract's execution to aid in construing the contract's language if the evidence only gives the contract's language a meaning consistent with that which is reasonably susceptible. *See id.* at 765. "[U]nderstanding the context in which an agreement was made is essential in determining the parties' intent as *expressed in the agreement*, but it is the parties' *expressed intent* that the court must determine." *Id*. (citations omitted). "Extrinsic evidence cannot be used to show that the parties probably meant, or could have meant, something other than what their agreement stated." *Anglo-Dutch Petrol. Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 451 (Tex. 2011). Nor can extrinsic evidence be used to "add to, alter, or contradict the terms contained within the agreement itself, [or] make the language say what it unambiguously does not say." *URI, Inc*, 543 S.W.3d at 768–69 (citations omitted).

When a contract is worded so that it can be given a certain or definite legal meaning, it is unambiguous, and the court construes it as a matter of law. *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003). Only when contract language is susceptible to more than one reasonable interpretation does an ambiguity exist. *URI, Inc*, 543 S.W.3d at 765.

### C.  Whether Texas 1031 Breached the Contract with CC&T

Initially, we note that CC&T does not contend the terms in the contract do not mean what they say or that the parties did not agree on the meaning of the language contained in the contract. Rather, CC&T argues on appeal that we should only consider the Engagement Agreement as well as extrinsic evidence that CC&T insists represents the services Texas 1031 promised to perform.

First, the Engagement Agreement clearly refers to the preparation of the Exchange Agreement and specifically explains that for CC&T to obtain the tax benefits of a 1031 exchange, it "must satisfy the technical requirements" and therefore the provided Exchange Instructions should be reviewed. Nothing supports CC&T's argument that we should consider the Engagement Agreement in isolation. Additionally, "the general rule is that separate instruments or contracts executed at the same time, for the same purpose, and in the course of the same transaction are to be considered as one instrument and construed together." *Washington-Jarmon v. Onewest Bank, FSB*, 513 S.W.3d 103, 108–09 (Tex. App.—Houston [14th Dist.] 2016 no pet.) (citing *Jones v. Kelley*, 614 S.W.2d 95, 98 (Tex. 1981)). Thus, we consider all the documents pertaining to the 1031 exchange and construe them together.

Furthermore, CC&T cannot now use extrinsic evidence to alter or add provisions to the parties' agreement to provide its interpretation of the services Texas 1031 agreed to perform. None of the provisions contained in the parties' agreements leads to more than one reasonable interpretation; thus, we conclude the provisions in the documents do not contain ambiguities, and the contract's terms can be construed as a matter of law. *See URI, Inc*, 543 S.W.3d at 765; *Schaefer*, 124 S.W.3d at 157. Additionally, the Exchange Agreement contains a merger clause, which is "a contractual provision mandating that the written terms of the contract may not be varied by prior agreements because all such agreements have been merged into the new document." *Allen Drilling Acquisition Co. v. Crimson Expl. Operating Inc.*, 558 S.W.3d 761, 772 (Tex. App.—Waco 2018, pet. denied).

Therefore, when considering the elements of a breach of contract claim, the relevant question on appeal here only pertains to whether Texas 1031 breached the contract with CC&T.

*See Brooks v. Excellence Mortg., Ltd.*, 486 S.W.3d 29, 36 (Tex. App.—San Antonio 2015, pet. denied) (setting forth the elements of a breach of contract claim).

The Exchange Agreement sets forth the rights and obligations of the parties in this transaction: Texas 1031 agreed to act as a qualified intermediary "in a tax-deferred exchange pursuant to section 1031 of the Internal Revenue Code" at a cost of $750 to CC&T. The record on appeal supports that Texas 1031 fulfilled its contractual duties, a basic exchange—providing "all necessary services for one relinquished property and one replacement property"—for CC&T's payment of $750. The documents set forth the additional steps CC&T must have taken to set up the EAT that would in turn hold title to the replacement property and oversee the desired improvements to the replacement property prior to transferring title to the replacement property to CC&T. CC&T followed none of these steps.

Moreover, throughout the documents, several provisions informed CC&T of Texas 1031's independent status cautioning CC&T to seek professional advice from its own accountants, tax professionals, and attorneys. Texas law is well settled that parties to an agreement are obligated "to protect themselves by reading what they sign." *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex. 1962). It is not the courts' role to protect parties from their own agreements. *Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 425 (Tex. 2015). We cannot, therefore, excuse a party's failure to read an agreement when the party had the opportunity to do so. *See id.* Instead, "the law presumes that the party knows and accepts the contract terms." *Id*. Although CC&T's owner, Pat McMahan, provided deposition testimony that he did not read the documents he signed and the various documents were just placed in front of him to sign at closing, he made no representation that he requested additional time but was not given the opportunity to read the documents he signed. A cursory review of the documents and the closing statement would have

revealed different costs associated with different actions as well as multiple warnings and instructions to seek independent legal and accounting advice associated with the 1031 exchange. CC&T is not excused for its failure to read the documents.

Therefore, regardless of CC&T's allegations that Texas 1031 made oral representations to provide CC&T with services to avoid realizing any capital gains tax, "a party to a written contract cannot justifiably rely on oral misrepresentations regarding the contract's unambiguous terms." *Id.* at 424. Reliance on an oral representation is unjustified when the oral representation is "directly contradicted by the express, unambiguous terms of a written agreement between the parties." *DRC Parts & Accessories, L.L.C. v. VM Motori, S.P.A.*, 112 S.W.3d 854, 858 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). A "party who enters into a written contract while relying on a contrary oral agreement does so at its peril." *Id.* at 859.

We conclude Texas 1031 did not breach the contract with CC&T. Accordingly, we overrule CC&T's issues one to the extent it pertains to its breach of contract claim, two, three, four, five, and seven.[5]

## CONCLUSION

We affirm the trial court's final judgment.

Irene Rios, Justice

---

[5] Because we affirm the trial court's judgment that Texas 1031 did not breach its contract with CC&T, we need not address CC&T's sixth issue or Texas 1031's conditional cross-point as to whether the parties' agreement contained an enforceable limitation of damages provision. *See* TEX. R. APP. P. 47.1 (requiring the appellate court to issue a written opinion that is as brief as practicable but that addresses all issues necessary to a final disposition of the case being appealed).